# IN THE SUPREME COURT OF IOWA

No. 08–1762

Filed November 19, 2010

**STATE OF IOWA,**

Appellee,

vs.

**ROBERT JOSEPH VANCE,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, George L. Stigler, Judge.

The defendant appeals his convictions for possession of precursor products with the intent to manufacture methamphetamine and driving while license barred. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Thomas J. Gaul, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Darrel L. Mullins, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Brad P. Walz, Assistant County Attorney, for appellee.

**WIGGINS, Justice.**

The defendant, Robert Joseph Vance, appeals his convictions for possession of precursor products with the intent to manufacture methamphetamine and driving while license barred. The court of appeals affirmed his convictions and preserved his ineffective-assistance-of-counsel claim for possible postconviction relief proceedings. The defendant applied for further review, which we granted. In our review, we find there was reasonable suspicion to initiate an investigatory stop of the vehicle the defendant was driving and substantial evidence supports his conviction for possession of a precursor product with the intent to manufacture methamphetamine. We also find we cannot decide the defendant's ineffective-assistance-of-counsel claim on direct appeal and preserve this claim for possible postconviction relief proceedings. Accordingly, we affirm the decision of the court of appeals and the judgment of the district court.

## I. Background Facts and Proceedings.

At approximately 2:20 a.m. on July 11, 2008, Waterloo police officer Nicholas Berry was patrolling the South View Estates area of Waterloo in a marked patrol car. While patrolling the area, Berry passed an oddly parked red Pontiac Grand Prix on Bristol Road. He ran the license plate number of the vehicle on his in-car computer and discovered the registered owner of the vehicle was a female named Athena Smith. Berry then verified the status of Smith's driver's license and learned her license was suspended.

After doing this, Berry remembered he had stopped the vehicle on December 13, 2007. On that occasion, Smith was operating the vehicle, and following a search of the vehicle, methamphetamine was found. He also remembered witnessing another officer stop the same vehicle on

June 2, 2008. The officer later informed him that Smith had been operating the vehicle and a male named Robert Vance was a passenger. Berry also learned the State charged Smith with driving while license suspended and possession of methamphetamine in relation to the later stop.

Berry left the area and parked his patrol car on Highway 218, north of the vehicle's location. Approximately fifteen minutes later, he observed the vehicle turn northbound on Highway 218 and drive past him. Berry was unable to see who was operating the vehicle or the number of its occupants. He decided to follow the vehicle and caught up to it as it was heading northbound. Just as Berry caught up with the vehicle, it began to exit onto Interstate 380 towards Evansdale. When the vehicle began to exit, Berry initiated a traffic stop, and the vehicle slowed to a stop on the off-ramp of Highway 218. Berry admitted the driver of the vehicle was not driving in a suspicious manner at the time he initiated the stop. When he initiated the stop, he did not know who was driving the vehicle.

As Berry exited his patrol car and approached the vehicle, he was able to observe for the first time that the vehicle's only occupant was a male driver. Berry recognized the driver but could not recall his name. He made contact with the driver and requested a driver's license and proof of insurance. The driver told Berry he did not have a driver's license and handed him an Iowa nondriver's identification card, identifying himself as Robert Joseph Vance. Vance also said he did not know if there was an insurance card in the vehicle because he did not own it. At this point, Berry remembered the connection between Vance and Smith. Specifically, Berry remembered Vance was a passenger in Smith's vehicle when he observed another officer stop the vehicle on

June 2. He also remembered Vance did not have a valid driver's license at that time.

Berry returned to his patrol car with Vance's identification card and discovered Vance's driver's license status was barred. He returned to the vehicle, informed Vance his license was invalid, and asked him to step out of the vehicle and walk to the front of his patrol car. Next, he asked Vance if he had anything illegal in his pockets. Vance removed an insulin needle, a wooden cooking spoon, and a metal spoon with burn marks from his pockets. There was a white, powdery substance on both the wood and metal spoons. Vance began to appear nervous, and Berry placed him in the back of his patrol car.

Subsequently, Berry returned to the vehicle and, looking through the front driver's side window, observed what appeared to be freshly manufactured methamphetamine in a cellophane wrapper. As he reached into the vehicle to remove the wrapper, he immediately noticed a strong chemical odor. Berry continued to inspect the vehicle visually until another officer arrived on the scene, at which point he handcuffed Vance and read the *Miranda* warning. While handcuffing Vance, Berry noticed he had a cellular phone earpiece in his ear and discovered his cellular phone had been on during the duration of the stop. Immediately after Vance was initially placed in the patrol car, the car's audio equipment captured Vance saying, "He is going to find the shit," to someone on the phone.

The Tri-County Drug Task Force was contacted, and Berry was asked to look in the trunk of the vehicle for a tank that could hold anhydrous ammonia. Berry opened the trunk and observed an air-compressor tank that likely contained anhydrous ammonia. Shortly thereafter, two members of the task force arrived and took over the

search of the vehicle. Throughout the passenger compartment and trunk of the vehicle the officers discovered numerous products associated with the manufacture of methamphetamine, including: a plastic pitcher with white residue, muriatic acid, saw blades, plastic tubing placed through a cap, a coffee grinder with reddish/white residue, coffee filters, a toothbrush, pliers and vice grip tools, stripped lithium batteries, canisters of Coleman fuel, orange tubing, insulin syringes, a large air-compressor tank filled with anhydrous ammonia, and a recent receipt for cold medicine that contained pseudoephedrine. The Iowa Department of Criminal Investigation later confirmed the wrapper, the metal spoon with burn marks and white residue, and the plastic pitcher with white residue all contained methamphetamine.

The State charged Vance with possession of ephedrine and/or pseudoephedrine, lithium, and anhydrous ammonia with the intent to manufacture a controlled substance, as well as driving while license barred. The State also sought to enhance Vance's sentencing pursuant to Iowa Code sections 124.411, 902.8, and 902.9 (2007) due to his status as a second and habitual offender.

Vance filed a motion to suppress evidence, claiming the State illegally seized evidence from the vehicle because Berry did not have reasonable suspicion to stop the vehicle he was operating. The district court overruled the motion, finding under the totality of the circumstances it was reasonable for Berry to infer that Smith—the registered owner whom Berry knew had a suspended license—was operating the vehicle. Accordingly, the case proceeded to trial.

The jury returned a verdict finding Vance guilty of possession of ephedrine and/or pseudoephedrine and possession of anhydrous ammonia with the intent to manufacture methamphetamine as well as

driving while license barred. The jury returned a verdict of not guilty on the charge of possession of lithium with the intent to manufacture methamphetamine. Vance appealed, arguing the district court erred in overruling his motion to suppress evidence, there was insufficient evidence for his conviction of possession of pseudoephedrine with the intent to manufacture methamphetamine, and his trial counsel was ineffective for failing to challenge the search of the vehicle. We transferred the case to the court of appeals. The court of appeals affirmed Vance's convictions and preserved his ineffective-assistance-of-counsel claim for possible postconviction relief proceedings. Vance sought further review, which we granted.

## II. Issues.

In this appeal, Vance raises three issues. First, we must determine whether there was reasonable suspicion to stop the vehicle Vance was driving. Next, we must decide whether substantial evidence supports Vance's conviction for possession of pseudoephedrine with the intent to manufacture methamphetamine. Finally, we must consider whether Vance's trial counsel was ineffective for failing to challenge the search of the vehicle.

## III. Legality of the Investigatory Stop.

**A. Scope of Review.** Vance claims the investigatory stop of the vehicle he was operating violated his Fourth Amendment right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. We review constitutional issues de novo. *State v. Freeman*, 705 N.W.2d 293, 297 (Iowa 2005). In the district court and on appeal, Vance's counsel failed to raise the legality of the stop under the Iowa Constitution. *See State v. Effler*, 769 N.W.2d 880, 894–95 (Iowa) (Appel, J., concurring) (discussing why counsel should raise and brief an independent analysis

of a constitutional issue under the Iowa Constitution), *cert. denied*, ____ U.S. ____, 130 S. Ct. 1024, 175 L. Ed. 2d 627 (2009). For this reason, we will limit our discussion regarding the legality of the stop to the Fourth Amendment.

We independently evaluate the totality of the circumstances found in the record, including the evidence introduced at both the suppression hearing and at trial. *State v. Bogan*, 774 N.W.2d 676, 679–80 (Iowa 2009). We give deference to the district court's findings of fact due to its ability to assess the credibility of the witnesses. *State v. Carter*, 696 N.W.2d 31, 36 (Iowa 2005). We are not, however, bound by those findings. *Id.*

**B. Applicable Law.** The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. This amendment was made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691, 6 L. Ed. 2d 1081, 1090 (1961).

Generally, unless an exception applies, a search or seizure must be conducted pursuant to a warrant to be reasonable. *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002). One well-established exception allows an officer to briefly stop an individual or vehicle for investigatory purposes when the officer has a reasonable, articulable suspicion that a criminal act has occurred, is occurring, or is about to occur. *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 675, 145 L. Ed. 2d 570, 576 (2000); *State v. Kinkead*, 570 N.W.2d 97, 100 (Iowa 1997). "The principal function of an investigatory stop is to resolve the ambiguity as to whether criminal activity is afoot." *State v. Richardson*, 501 N.W.2d 495, 497

(Iowa 1993). Accordingly, reasonable suspicion may support an investigatory stop that ultimately reveals wholly lawful conduct. *Id.*

For an investigatory stop to comply with the protections of the Fourth Amendment, the State must prove by a preponderance of the evidence the officer had specific and articulable facts that, taken together with rational inferences from those facts, would lead the officer to reasonably believe criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889, 906 (1968); *State v. Heminover*, 619 N.W.2d 353, 357–58 (Iowa 2000), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). A mere hunch, unparticularized suspicion, or curiosity will not justify an investigatory stop. *Kreps*, 650 N.W.2d at 641.

> Whether reasonable suspicion exists for an investigatory stop must be determined in light of the totality of the circumstances confronting a police officer, including all information available to the officer at the time the decision to stop is made. The circumstances under which the officer acted must be viewed "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."

*Id.* at 642 (internal citations omitted) (quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C. Cir. 1976)). If the State fails to carry its burden, all evidence obtained from the investigatory stop must be suppressed. *Kinkead*, 570 N.W.2d at 100.

**C. Analysis.** Vance claims reasonable suspicion did not support the investigatory stop of the vehicle because the stopping officer merely knew the registered owner of the vehicle had a suspended driver's license but had no information about the identity of the driver. Vance argues an officer must obtain information indicating the driver of the vehicle is the registered owner before reasonable suspicion for an investigatory stop arises.

If Berry had an articulable and reasonable suspicion the driver of the vehicle did not have a valid driver's license, he was entitled to stop the vehicle and briefly detain the driver to investigate his or her driver's license status. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S. Ct. 1391, 1401, 59 L. Ed. 2d 660, 673 (1979) (holding an officer must at least have reasonable suspicion before stopping an automobile for the purpose of checking the validity of the operator's license and registration). Accordingly, we must determine when reasonable suspicion for an investigatory stop of a vehicle arises upon an officer's discovery that the registered owner of the vehicle has a suspended license.

We hold an officer has reasonable suspicion to initiate an investigatory stop of a vehicle to investigate whether the driver has a valid driver's license when the officer knows the registered owner of the vehicle has a suspended license, and the officer is unaware of any evidence or circumstances indicating the registered owner is not the driver of the vehicle.

We reach this conclusion for a number of reasons. First, it is reasonable for an officer to infer the registered owner of the vehicle will do the vast amount of the driving. *See, e.g., Vill. of Lake in the Hills v. Lloyd*, 591 N.E.2d 524, 525–26 (Ill. App. Ct. 1992) (recognizing common sense allows an officer to reasonably infer the owner of a vehicle is also the driver); *People v. Barnes*, 505 N.E.2d 427, 428 (Ill. App. Ct. 1987) ("While other people may drive an owner's vehicle, it is clear that the owner will do the vast amount of driving."); *Commonwealth v. Deramo*, 762 N.E.2d 815, 818 (Mass. 2002) (finding the likelihood that a vehicle's driver is its owner is strong enough to satisfy the reasonable-suspicion standard). Although this inference may be fallible, it is sufficiently reasonable to generate reasonable suspicion for an investigatory stop to

resolve the ambiguity as to whether criminal activity is afoot. *State v. Newer*, 742 N.W.2d 923, 925 (Wis. Ct. App. 2007); *see also Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S. Ct. 2793, 2800, 111 L. Ed. 2d 148, 159 (1990) (stating, in order to satisfy the reasonableness requirement of the Fourth Amendment, officers need not always be correct, but must always act reasonably).

Second, to forbid the police from relying on such an inference to form reasonable suspicion for an investigatory stop would seriously limit an officer's ability to investigate suspension violations because there are few, if any, additional steps the officer can utilize to establish the driver of a vehicle is its registered owner. *Barnes*, 505 N.E.2d at 428. Vance argues a stopping officer must verify the driver is the registered owner of the vehicle before reasonable suspicion for an investigatory stop exists. This proposed standard, however, places too heavy a burden on the police. It would be impossible for an officer to verify that a driver of a vehicle fits the description of the registered owner in heavy traffic, if the vehicle has darkly tinted windows, or if the stop occurs at night, as was the case here. *Armfield v. State*, 918 N.E.2d 316, 322 (Ind. 2009). Furthermore, the standard we adopt adequately protects against suspicionless investigatory stops because:

> If an officer comes upon information suggesting that the assumption [that the driver is the owner] is not valid in a particular case, for example that the vehicle's driver appears to be much older, much younger, or of a different gender than the vehicle's registered owner, reasonable suspicion would, of course, dissipate. There would simply be no reason to think that the nonowner driver had a revoked [or suspended] license.

*Newer*, 742 N.W.2d at 926; *accord People v. Jones*, 678 N.W.2d 627, 631 n.4 (Mich. Ct. App. 2004); *State v. Pike*, 551 N.W.2d 919, 922 (Minn. 1996); *State v. Howard*, 766 N.E.2d 179, 183 (Ohio Ct. App. 2001).

Third, allowing a stopping officer to infer the registered owner is the driver, absent any evidence to the contrary, ensures the safety of the roadways and of law enforcement. As one court has recognized,

> requiring the officer to verify the driver of the vehicle strikes against basic principles of safety [because it] puts the onus on the officer to maneuver himself into a position to clearly observe the driver in the midst of traffic.

*Armfield*, 918 N.E.2d at 322 (internal quotation omitted). Thus, the verification requirement proposed by Vance would not only place the stopping officer in danger but also the traveling public in general.

Finally, we have reviewed cases from other jurisdictions that have considered this issue, and a majority of those jurisdictions have adopted the standard we approve today. *Compare id.* at 321–22 (holding officers may stop a vehicle and investigate the license status of the driver based on information that the owner has a suspended license so long as the officer is unaware of any facts indicating the owner is not driving the vehicle); *State v. Tozier*, 905 A.2d 836, 839 (Me. 2006) (same); *Commonwealth v. Garden*, 883 N.E.2d 905, 909 (Mass. 2008) (same); *Jones*, 678 N.W.2d at 631 (same); *Pike*, 551 N.W.2d at 922 (same); *City of Billings v. Costa*, 140 P.3d 1070, 1073–74 (Mont. 2006) (same); *State v. Richter*, 765 A.2d 687, 689 (N.H. 2000) (same); *Howard*, 766 N.E.2d at 183 (same); *State v. Panko*, 788 P.2d 1026, 1027 (Or. Ct. App. 1990) (same); *Newer*, 742 N.W.2d at 925–26 (same), *with State v. Parks*, 672 A.2d 742, 745 (N.J. Super. Ct. App. Div. 1996) (requiring additional evidence of the owner's identity as the driver of the vehicle before reasonable suspicion for an investigatory stop arises). We find the rationale for the majority position as expressed in these cases most persuasive.

In this case, Berry ran the license plate of the vehicle on his in-car computer and discovered the registered owner of the vehicle, Athena Smith, had a suspended license. Subsequently, Berry observed the vehicle drive past him, and he initiated a traffic stop to investigate whether the registered owner was the driver. At the time he initiated the stop, Berry was unable to observe the sex or the identity of the driver. Thus, at the time of the investigatory stop, Berry was unaware of any evidence or circumstances rendering his inference that the owner of the vehicle was also the driver, unreasonable. Accordingly, the court of appeals and the district court were correct in holding the stopping officer had reasonable suspicion to initiate an investigatory stop of the vehicle Vance was operating.[1]

---

[1]Although the investigatory stop was initially supported by reasonable suspicion, Vance's counsel failed to raise in the district court or on appeal whether the stop continued to be valid upon the stopping officer's discovery that the driver of the vehicle was, in fact, not the registered owner. *See, e.g.*, *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229, 238 (1983) (plurality opinion) (recognizing the scope of an investigatory stop must be carefully tailored to its underlying justification and last no longer than necessary to effectuate the purpose of the stop); *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889, 905 (1968) (requiring an investigatory stop to be "reasonably related in scope to the circumstances which justified the interference in the first place"). A number of jurisdictions have invalidated the further detention or investigation of a suspect after the initial purpose of an investigatory stop has been resolved. *See, e.g.*, *United States v. Valadez*, 267 F.3d 395, 398–99 (5th Cir. 2001) (holding where an officer properly initiated a stop to investigate a motor-vehicle law violation and learned no violation had occurred, the purpose of the investigatory stop was satisfied and any further detention or investigation violated the Fourth Amendment); *United States v. McSwain*, 29 F.3d 558, 561–62 (10th Cir. 1994) (same); *People v. Redinger*, 906 P.2d 81, 85–86 (Colo. 1995) (same); *State v. Diaz*, 850 So. 2d 435, 439–40 (Fla. 2003) (same); *State v. Silva*, 979 P.2d 1106, 1107 (Haw. 1999) (same); *Holly v. State*, 918 N.E.2d 323, 325–26 (Ind. 2009) (same); *State v. Kaufman*, 59 P.3d 1166, 1172 (Mont. 2002) (same); *State v. Chatton*, 463 N.E.2d 1237, 1240–41 (Ohio 1984) (per curiam) (same); *McGaughey v. State*, 37 P.3d 130, 140–41 (Okla. Crim. App. 2001) (same); *State v. Farley*, 775 P.2d 835, 836 (Or. 1989) (same); *State v. Penfield*, 22 P.3d 293, 295–96 (Wash. Ct. App. 2001) (same); 4 Wayne R. LaFave, *Search and Seizure* §§ 9.2(f), .3(c), at 335, 379–80 n.95 (4th ed. 2004) (same). Accordingly, we express no opinion on the merits of this issue because it has not been preserved for our appellate review.

### IV. Insufficient-Evidence Claim.

**A. Standard of Review.** Vance complains there was not sufficient evidence to support his conviction for possession of ephedrine and/or pseudoephedrine with the intent to manufacture methamphetamine. We review sufficiency-of-the-evidence challenges for correction of errors at law. *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006). We will sustain the jury's verdict if it is supported by substantial evidence. *State v. Acevedo*, 705 N.W.2d 1, 3 (Iowa 2005). "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *State v. Jorgensen*, 758 N.W.2d 830, 834 (Iowa 2008).

**B. Analysis.** Vance argues there was insufficient evidence as a matter of law to prove he possessed pseudoephedrine with the intent to manufacture methamphetamine. In order to prove unlawful possession of a precursor product with the intent to manufacture methamphetamine, the State must prove beyond a reasonable doubt: (1) the person exercised dominion and control over the precursor product, (2) the person had knowledge of the precursor product's presence and nature, and (3) the person possessed the precursor product with the intent that the product be used to manufacture methamphetamine. Iowa Code § 124.401(4); *State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008).

"In the realm of controlled substance prosecutions, possession can be either actual or constructive." *State v. Cashen*, 666 N.W.2d 566, 569 (Iowa 2003). Actual possession may be shown by direct or circumstantial evidence. *State v. Reeves*, 209 N.W.2d 18, 21–22 (Iowa 1973). A person has actual possession of a precursor product when the product is found on the person. *Maxwell*, 743 N.W.2d at 193. Although

the pseudoephedrine was not found on Vance's person at the time of the stop, substantial evidence supports the jury's finding that at one time Vance had actual possession of the pseudoephedrine with the intent to manufacture methamphetamine.

The record contains circumstantial evidence to support the jury's finding that at one time Vance actually possessed the 2.4 grams of pseudoephedrine listed in the CVS Pharmacy receipt, which was discovered in the vehicle. CVS Pharmacy's records show on July 10, 2008, at approximately 6:19 p.m., CVS sold 2.4 grams of pseudoephedrine to an individual who produced Vance's identification card. Approximately eight hours later, Berry stopped the vehicle Vance was operating. At that time, Vance was the only person in the vehicle, and he had his identification card with him. On the front driver's side of the vehicle, an officer discovered a July 10, 2008, CVS receipt for twelve-hour cold medicine containing 2.4 grams of pseudoephedrine and time stamped at 6:19 p.m., matching CVS's records. Officers found a coffee grinder with reddish/white residue in the backseat that was consistent with grinding pseudoephedrine pills. In the front of the vehicle, in plain view of Vance, recently manufactured methamphetamine was discovered in a cellophane wrapper. Finally, Vance began to appear nervous after he removed two spoons and an insulin needle from his pockets and later stated, "He is going to find the shit," after being placed in a patrol car.

Based upon this evidence, a jury could reasonably infer Vance had actual possession of the pseudoephedrine pills because it could find he purchased the pills from CVS and either he, or someone else, used the pills to manufacture the methamphetamine found in the front portion of the vehicle. Thus, we conclude this evidence could convince a rational

trier of fact beyond a reasonable doubt that Vance possessed 2.4 grams of pseudoephedrine.

We also conclude substantial evidence supports the finding Vance possessed the pseudoephedrine with the intent it be used to manufacture methamphetamine. A person intends a precursor product to be used to manufacture methamphetamine so long as the person directly or indirectly intends to engage in the manufacturing process. *See State v. Truesdell*, 679 N.W.2d 611, 617–18 (Iowa 2004) (construing the legislature's 2004 amendment of the intent element of Iowa Code section 124.401(4)); *State v. Milom*, 744 N.W.2d 117, 122 (Iowa Ct. App. 2007) (same). Vance's admission, the proximity in time from when Vance initially purchased the pseudoephedrine to the time he was stopped, the presence of freshly produced methamphetamine in the vehicle, the coffee grinder with pseudoephedrine-pill residue, and the numerous items associated with the manufacture of methamphetamine discovered in the vehicle all could lead a jury to reasonably infer Vance possessed the pseudoephedrine with the intent the product be used to manufacture methamphetamine.

Thus, the court of appeals correctly affirmed Vance's conviction for possession of pseudoephedrine with the intent to manufacture methamphetamine because substantial evidence supported the jury's verdict.

**V. Ineffective-Assistance-of-Counsel Claim.**

**A. Standard of Review.** Ineffective-assistance-of-counsel claims have their basis in the Sixth Amendment to the United States Constitution. *State v. Lyman*, 776 N.W.2d 865, 877 (Iowa 2010). Normally, ineffective-assistance-of-counsel claims are considered in postconviction relief proceedings. *State v. Graves*, 668 N.W.2d 860, 869

(Iowa 2003). However, if the record is sufficient to address a claim of ineffective assistance of counsel, we will consider such a claim on direct appeal. *Id.*

**B. Ineffective-Assistance-of-Counsel Standard.** To establish an ineffective-assistance-of-counsel claim, a defendant must prove by a preponderance of the evidence: (1) his trial counsel failed to perform an essential duty, and (2) prejudice resulted. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984); *State v. Dudley*, 766 N.W.2d 606, 620 (Iowa 2009).

**C. Whether Trial Counsel Failed to Perform an Essential Duty.**

1. *General principles.* To establish his trial counsel failed to perform an essential duty, Vance must prove his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693. We begin with a presumption that counsel performed his or her duties competently. *Dudley*, 766 N.W.2d at 620. "Trial counsel's performance is measured objectively by determining whether counsel's assistance was reasonable, under prevailing professional norms, considering all the circumstances." *Lyman*, 776 N.W.2d at 878. The Supreme Court indicates the American Bar Association standards and like documents reflect the prevailing norms of practice. *Strickland,* 466 U.S. at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694. The ABA Standards for Criminal Justice require:

> (e) Defense counsel, in common with all members of the bar, is subject to standards of conduct stated in statutes, rules, decisions of courts, and codes, canons, or other standards of professional conduct. Defense counsel has no duty to execute any directive of the accused which does not comport with law or such standards. Defense counsel is the professional representative of the accused, not the accused's alter ego.

ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-1.2(e), at 120–21 (3d ed. 1993). The comments to the ABA standards state:

> Advocacy is not for the timid, the meek, or the retiring. Our system of justice is inherently contentious, albeit bounded by the rules of professional ethics and decorum, and it demands that the lawyer be inclined toward vigorous advocacy. Nor can a lawyer be half-hearted in the application of his or her energies to a case. Once a case has been undertaken, a lawyer is obliged not to omit any essential lawful and ethical step in the defense, without regard to compensation or the nature of the appointment. . . .
>
> Because the law is a learned profession, lawyers must take pains to guarantee that their training is adequate and their knowledge up-to-date in order to fulfill their duty as advocates.

*Id.* cmt., at 122–23 (footnote omitted).

In our own analysis of whether counsel was ineffective, we have relied on our Code of Professional Responsibility for Lawyers to measure counsel's performance. *State v. Schoelerman*, 315 N.W.2d 67, 71–72 (Iowa 1982). At the time of Vance's representation, the Iowa Rules of Professional Conduct governed a lawyer's conduct. The rules provide that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Iowa R. Prof'l Conduct 32:1.1. As a comment to this rule points out, "[s]ome important legal skills, such as the analysis of precedent, the evaluation of evidence, and legal drafting, are required in all legal problems." *Id.* cmt. [2]. In the final analysis,

> As long as the requisite competence to handle the matter may be attained through reasonable preparation and study, the lawyer ethically may undertake the representation. The measuring rod of competence is that of the reasonably able and effective attorney, with general professional education

and experience, who diligently devotes him or herself to scholarly study of the governing legal principles and development of the practice skills necessary.

16 Gregory C. Sisk & Mark S. Cady, *Iowa Practice Series: Lawyer and Judicial Ethics* § 5:1(b), at 140 (2007). We will use these principles to determine if Vance's trial counsel failed to perform an essential duty.

Vance claims his trial counsel was ineffective for failing to challenge the search of the vehicle under the Iowa Constitution. Specifically, he claims the search was an unlawful search incident to an arrest for the same reasons the United States Supreme Court held such a search was unlawful in *Arizona v. Gant,* ___ U.S. ___, ___, 129 S. Ct. 1710, 1719, 173 L. Ed. 2d 485, 496 (2009). *Gant* limited the holding of *New York v. Belton,* 453 U.S. 454, 460–61, 101 S. Ct. 2860, 2864, 69 L. Ed. 2d 768, 775 (1981). *Gant,* ___ U.S. at ___, 129 S. Ct. at 1719, 173 L. Ed. 2d at 496.

The State responds to Vance's claim of ineffective assistance of counsel by arguing that in 1981 the Iowa Supreme Court adopted the *Belton* rule as the proper analysis under the Iowa Constitution. *State v. Sanders*, 312 N.W.2d 534, 539 (Iowa 1981). It also argues, because the United States Supreme Court did not overturn the broad interpretation of *Belton* until after Vance's conviction, Vance's attorney could not have been ineffective for failing to question established law.

2. *The* Belton *decision.* Under the Fourth Amendment, the Supreme Court has long recognized the lawful custodial arrest of a person justifies the contemporaneous search of the person arrested and of the immediately surrounding area, meaning the area from which the person might gain possession of a weapon or destructible evidence. *Chimel v. California*, 395 U.S. 752, 762–63, 89 S. Ct. 2034, 2040, 23 L. Ed. 2d 685, 694 (1969). The Supreme Court created this exception to

the warrant requirement to serve the dual purposes of protecting arresting officers and safeguarding any evidence the arrestee may seek to conceal or destroy. *Id.* We have stated, "The search-incident-to-arrest exception to the warrant requirement must be narrowly construed and limited to accommodating only those interests it was created to serve." *State v. McGrane*, 733 N.W.2d 671, 677 (Iowa 2007).

Courts struggled to define the proper scope of a search of the interior of an automobile incident to a lawful custodial arrest of its occupant. *Belton*, 453 U.S. at 459, 101 S. Ct. at 2863, 69 L. Ed. 2d at 774. In *Belton*, the Supreme Court sought to remedy this problem by holding, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" as well as any containers found within the passenger compartment. *Id.* at 460, 101 S. Ct. at 2864, 69 L. Ed. 2d at 775. In so holding, the Court relied heavily on the generalization that articles within the passenger compartment of a vehicle are generally, if not inevitably, within the arrestee's grab area. *Id.*

Although *Belton* did not alter the justifications for the search-incident-to-arrest exception as recognized in *Chimel*, the opinion has been interpreted in many jurisdictions, including this one, as permitting a vehicle search incident to the arrest of a recent occupant even when there is no possibility the arrestee could gain access to the vehicle's passenger compartment at the time of the search. *See, e.g., Thornton v. United States*, 541 U.S. 615, 628–29, 124 S. Ct. 2127, 2135, 158 L. Ed. 2d 905, 917–18 (2004) (Scalia, J., concurring) (recognizing that reported cases upholding searches of vehicles incident to arrest when the arrestee is handcuffed, restrained in the back of a patrol car, and not within

reach of the passenger compartment are legion); *State v. Edgington*, 487 N.W.2d 675, 677–78 (Iowa 1992) (upholding the search of a vehicle's passenger compartment incident to the arrest of its occupant under the Fourth Amendment even though the arrestee had been taken away from the vehicle and could not reach the passenger compartment); *Sanders*, 312 N.W.2d at 539 (adopting *Belton*'s bright-line rule). Under this broad interpretation of *Belton*, a vehicle search is permissible incident to every arrest of a recent occupant, regardless of whether the vehicle's passenger compartment is within the arrestee's reach at the time of the search. *Gant*, ___ U.S. at ___, 129 S. Ct. at 1719, 173 L. Ed. 2d at 496.

3. *Iowa's reaction to the* Belton *decision.* Iowa appears to be the first state to adopt *Belton* as part of its state constitutional doctrine. *Sanders*, 312 N.W.2d at 539. In *Sanders*, our court said, "*Belton* strikes a reasonably fair balance between the rights of the individual and those of society." *Id.* Our court has only cited *Sanders* on two occasions concerning the *Belton* rule. *State v. Garcia*, 461 N.W.2d 460, 463 (Iowa 1990); *State v. Farni*, 325 N.W.2d 107, 109 (Iowa 1982). In each case, the defendant did not question the continued viability of *Belton*. *Garcia*, 461 N.W.2d at 463; *Farni*, 325 N.W.2d at 109.

4. *National reaction to the* Belton *decision.* Soon after the Court decided *Belton*, numerous authors sharply criticized the broad interpretation of *Belton*. *See, e.g.*, Albert W. Alschuler, *Bright Line Fever and the Fourth Amendment*, 45 U. Pitt. L. Rev. 227, 274–75 (1984); Catherine Hancock, *State Court Activism and Searches Incident to Arrest*, 68 Va. L. Rev. 1085, 1129–32 (1982); Wayne R. LaFave, *The Fourth Amendment in an Imperfect World:  On Drawing 'Bright Lines' and 'Good Faith,'* 43 U. Pitt. L. Rev. 307, 325 (1982); David S. Rudstein, *The Search*

*of an Automobile Incident to an Arrest: An Analysis of* New York v. Belton, 67 Marq. L. Rev. 205, 261 (1984).

State courts also began to react to *Belton* under their own constitutions. Five states adopted *Belton* as their own state's constitutional doctrine. *See, e.g., Stout v. State*, 898 S.W.2d 457, 460 (Ark. 1995); *State v. Waller*, 612 A.2d 1189, 1193–94 (Conn. 1992); *State v. Charpentier*, 962 P.2d 1033, 1037 (Idaho 1998); *Sanders*, 312 N.W.2d at 539; *State v. Rice*, 327 N.W.2d 128, 131–32 (S.D. 1982); *State v. Fry*, 388 N.W.2d 565, 574–75 (Wis. 1986), *overruled by State v. Dearborn*, 786 N.W.2d 97, 105 (Wis. 2010) (adopting *Gant*'s holding as Wisconsin's constitutional doctrine). Eight states have rejected *Belton* as their state's constitutional doctrine. *See, e.g., State v. Hernandez*, 410 So. 2d 1381, 1384–85 (La. 1982); *Camacho v. State*, 75 P.3d 370, 373–74 (Nev. 2003); *State v. Eckel*, 888 A.2d 1266, 1266 (N.J. 2006); *State v. Rowell*, 188 P.3d 95, 100 (N.M. 2008); *People v. Blasich*, 541 N.E.2d 40, 43 (N.Y. 1989); *Commonwealth v. White*, 669 A.2d 896, 901–02 (Pa. 1995); *State v. Bauder*, 924 A.2d 38, 46–47 (Vt. 2007); *Vasquez v. State*, 990 P.2d 476, 488–89 (Wyo. 1999).

In 2004 the United States Supreme Court decided *Thornton*. In *Thornton*, five members of the Supreme Court questioned the broad interpretation of *Belton*. *See Thornton*, 541 U.S. at 624–36, 124 S. Ct. at 2133–40, 158 L. Ed. 2d at 915–23 (O'Connor, J., concurring in part, Scalia, J., concurring, and Stevens, J., dissenting) (concurring and dissenting opinions joined by Justices O'Connor, Scalia, Ginsburg, Stevens, and Souter questioning a broad interpretation of *Belton*). In addition to the Supreme Court's questioning of the broad interpretation of *Belton*, a body of academic writings renewed its criticism of *Belton*. *See, e.g.,* Carol A. Chase, *Cars, Cops, and Crooks: A Reexamination of*

Belton *and* Carroll *With an Eye Toward Restoring Fourth Amendment Privacy Protection to Automobiles*, 85 Or. L. Rev. 913, 940–41 (2006); David S. Rudstein, Belton *Redux: Reevaluating* Belton*'s Per Se Rule Governing the Search of an Automobile Incident to an Arrest*, 40 Wake Forest L. Rev. 1287, 1359–60 (2005).

In July 2007 the Arizona Supreme Court gave *Belton* a narrow reading, by deciding that once the defendant and the other occupants of a vehicle were handcuffed and seated in the back of locked patrol cars, the Fourth Amendment required the officers to obtain a search warrant prior to searching the vehicle. *State v. Gant*, 162 P.3d 640, 643 (Ariz. 2007), *aff'd* ___ U.S. ___, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). The Supreme Court granted certiorari in *Gant* on February 25, 2008. *Arizona v. Gant*, 552 U.S. 1230, 1230, 128 S. Ct. 1443, 1443–44, 170 L. Ed. 2d 274, 274 (2008). All of this criticism of *Belton* and the granting of certiorari in *Gant* took place prior to Vance's arrest.

The Supreme Court decided *Gant* in April 2009. *Gant*, ___ U.S. at ___, 129 S. Ct. at 1710, 173 L. Ed. 2d at 485. The Court expressly rejected the broad interpretation of *Belton* and tethered *Belton*'s bright-line rule to the dual purposes underlying the search-incident-to-arrest exception as recognized in *Chimel*. *Id.* at ___, 129 S. Ct. at 1719, 173 L. Ed. 2d at 496. The Court held, under *Belton*, police may search the passenger compartment of a vehicle incident to a recent occupant's arrest "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id.* Accordingly, if an arrestee has been taken away from the vehicle, restrained, or is otherwise not within reach of the vehicle, a search incident to arrest can no longer be justified by the possibility the arrestee may secure a weapon or destroy evidence. *Id.* Furthermore, relying on

another justification underpinning the search-incident-to-arrest exception, the Court held "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Id.* (quoting *Thornton,* 541 U.S. at 632, 124 S. Ct. at 2137, 158 L. Ed. 2d at 920 (Scalia, J., concurring)).

5. *Application of general principles.* Although *Sanders* held Iowa's constitutional doctrine was the same as *Belton, Sanders* was decided before the criticism of *Belton* began. An attorney examining the authorities citing *Belton* and *Sanders* would have discovered the extensive criticism of the broad interpretation of *Belton.* Such an examination would also have revealed the fact that the United States Supreme Court had granted certiorari in the Arizona Supreme Court's decision in *Gant.* Furthermore, an attorney reviewing the authorities citing *Belton* and *Sanders* would have also learned that only five states, other than Iowa, had adopted *Belton* as their state's constitutional doctrine, while eight states had rejected it. Moreover, an attorney evaluating the law would have found the modern trend among the states was to reject the broad interpretation of *Belton.* An attorney could have discovered all of these developments regarding *Belton* by performing simple searches in electronic legal research databases such as Westlaw or LexisNexis.

After determining many courts and scholars were questioning the viability of *Belton,* counsel could have reviewed the development of search and seizure doctrine under the Iowa Constitution. In 2000 we began to emphasize our independence from adopting federal constitutional principles as Iowa's constitutional principles. *State v. Cline,* 617 N.W.2d 277, 284–85 (Iowa 2000), *abrogated on other grounds*

*by Turner*, 630 N.W.2d at 606 n.2. In *Cline*, we stated we would no longer abdicate our constitutional role in interpreting the Iowa Constitution by blindly following federal constitutional doctrine. *Id.* at 285. We emphasized that for federal constitutional doctrine to have any value, the doctrine " 'must be based on a convincing rationale.' " *Id.* (quoting *State v. James*, 393 N.W.2d 465, 472 (Iowa 1986) (Lavorato, J., dissenting)). Accordingly, we examined the Supreme Court's rationale for the good-faith exception and refused to adopt the good-faith exception under the Iowa Constitution because we found the rationale justifying its adoption to be neither sound nor persuasive. *Id.* at 288–93. Four years later, we found a violation of the Iowa Constitution, independent from the Federal Constitution. *See State v. Tague*, 676 N.W.2d 197, 205–06 (Iowa 2004) (finding a violation of article I, section 8 of the Iowa Constitution, independent from the Fourth Amendment to the United States Constitution). In *Tague*, we applied the Iowa Constitution to determine if a traffic stop passed muster under the Iowa Constitution. *Id.* Additionally, in numerous cases before Vance's arrest, we have consistently said we would no longer blindly follow federal precedent on issues of Iowa constitutional law and will accept United States Supreme Court precedent only as persuasive authority. *See, e.g., State v. Hoskins*, 711 N.W.2d 720, 725 (Iowa 2006); *State v. Allen*, 690 N.W.2d 684, 689–90 (Iowa 2005); *State v. Reinders*, 690 N.W.2d 78, 81–82 (Iowa 2004); *Cline*, 617 N.W.2d at 284–85.

At this point of the analysis, we would ordinarily analyze whether counsel's performance was unreasonable, under prevailing professional norms, for failing to challenge the continued viability of *Sanders* under the Iowa Constitution. *See State v. Lowry*, 667 P.2d 996, 1013 (Or. 1983) (Jones, J., concurring) (recognizing failure to raise a state

constitutional claim and relying solely on parallel provisions under the Federal Constitution should constitute ineffective assistance of counsel). However, under this record we are unable to do so.

In *Gant*, the Supreme Court noted that even if the *Belton* analysis, as limited by *Gant*, does not uphold the constitutionality of a search, other exceptions to the warrant requirement authorizing an officer to search a vehicle might be applicable to uphold the search. *Gant*, ___ U.S. at ___, 129 S. Ct. at 1721, 173 L. Ed. 2d at 498–99. Under the existing record, we cannot determine whether counsel failed to question *Belton* and *Sanders* because counsel believed another exception to the warrant requirement under the federal or state constitutions would have allowed the search of the vehicle. In addition, under the facts as developed thus far, we cannot determine if another exception to the warrant requirement applies under the Iowa Constitution.

Accordingly, we must decline to rule on Vance's claim of ineffective assistance of counsel for his counsel's failure to raise the issues surrounding *Gant* on direct appeal and preserve Vance's ineffective-assistance-of-counsel claim for possible postconviction relief proceedings.

**VI. Conclusion.**

We affirm the decision of the court of appeals and the judgment of the district court because there was reasonable suspicion to initiate an investigatory stop of the vehicle the defendant was driving, and substantial evidence supports his conviction for possession of a precursor product with the intent to manufacture methamphetamine. We preserve Vance's claim of ineffective assistance of counsel for possible postconviction relief proceedings.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Cady and Streit, JJ., who dissent.

**CADY, Justice (dissenting).**

I respectfully dissent from the holding of the majority to preserve the claim of ineffective assistance of counsel for postconviction relief. I dissent because I believe the record in this case is adequate for us to decide that trial counsel was not ineffective for failing to attack the viability of the search-incident-to-arrest exception to the warrant requirement in light of *Arizona v. Gant*, ___ U.S. ___, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009).

The record in this case is adequate because it reveals the search was clearly permitted under the well-recognized automobile exception to the warrant requirement. The majority's own opinion bears this out. The majority holds the arresting officer had reasonable grounds to stop the vehicle operated by Vance. Additionally, the majority acknowledges the arresting officer observed methamphetamine through the window of the vehicle during the stop. These facts, and others, clearly justify the search under the automobile exception. Consequently, a criminal defense lawyer cannot render ineffective assistance of counsel based on the failure to attack the viability of one exception to the warrant requirement when another exception applies under the circumstances of the case.

The automobile exception to the warrant requirement under the state and federal search and seizure clauses allows a warrantless search if there is probable cause to search the vehicle. *See State v. Allensworth*, 748 N.W.2d 789, 795 (Iowa 2008). The exception is justified based on the inherent mobility of a vehicle, as well as a lower expectation of privacy in vehicles. *State v. Cain*, 400 N.W.2d 582, 585 (Iowa 1987). This exception has been firmly planted in our Iowa jurisprudence for over

twenty years. *See State v. Olsen*, 293 N.W.2d 216, 219–20 (Iowa 1980) (applying the automobile exception to the warrant requirement under the Iowa Constitution). It has also been a part of our federal jurisprudence for even longer. Moreover, we have made it clear that our interpretation of the search and seizure clause under the Iowa Constitution conforms to the Search and Seizure Clause under the Federal Constitution. *See id.* at 220; *see also State v. Gillespie*, 619 N.W.2d 345, 350 (Iowa 2000) (noting that, while the application of the automobile exception focused on the Fourth Amendment to the Federal Constitution, the discussion on the issue was "equally applicable to [the defendant's] claim under the Iowa Constitution"), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2002).

The same facts used by the majority to uphold the stop in this case unquestionably made the search permissible under the automobile exception. We have numerous cases upholding a search of a vehicle when there is evidence of illegal drug activity in plain view. *See, e.g.*, *State v. Carter*, 696 N.W.2d 31, 38 (Iowa 2005) (finding sufficient probable cause to search vehicle upon seeing plastic container); *State v. Bergmann*, 633 N.W.2d 328, 338 (Iowa 2001) (upholding warrantless search after police dog alerted to narcotics); *Gillespie*, 619 N.W.2d at 353 (denying existence of sufficient probable cause for warrantless search of vehicle when officer did not see contraband, but merely saw the defendant's vehicle driving away from an anhydrous ammonia facility). Consequently, the ineffective-assistance-of-counsel claim raised by Vance on appeal is totally without merit.

Streit, J., joins this dissent.