# IN THE SUPREME COURT OF IOWA

No. 12–1491

Filed May 30, 2014

**STATE OF IOWA,**

    Appellee,

vs.

**TREMAYNE LATOINE THOMAS,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Thomas G. Reidel, Judge.

The State seeks further review of a court of appeals decision holding that the State presented insufficient evidence to support the defendant's convictions for possession of cocaine and marijuana with intent to deliver. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AND SENTENCE AFFIRMED.**

Lauren M. Phelps of Lauren M. Phelps, P.L.L.C., Davenport, for appellant.

Thomas J. Miller, Attorney General, Elisabeth S. Reynoldson (until withdrawal) and Benjamin M. Parrott, Assistant Attorneys General, Des Moines, and Michael J. Walton, County Attorney, and Kelly G. Cunningham, Assistant County Attorney, Davenport, for appellee.

**MANSFIELD, Justice.**

We are asked to decide today whether substantial evidence supports the defendant's convictions for possession of marijuana and crack cocaine with intent to deliver. After police entered an apartment occupied by several individuals, the defendant and one other person ran into the bedroom. The defendant tried to hold the bedroom door shut to prevent the police from entering. Eventually, an officer was able to force open the door. As the defendant attempted to engage in misdirection, police noticed the presence of sale packages of marijuana and crack cocaine in the area where the defendant had been standing and holding back the door. The defendant then gave a false name to the officers and falsely claimed he had fled from them because he had an outstanding warrant. Meanwhile, the other person who had run into the bedroom and the renter of the apartment both denied having anything to do with the drugs. Based on these facts, the jury found the defendant guilty of possession with intent to deliver, but the court of appeals reversed for insufficient evidence. On further review, we find the evidence sufficient to sustain a jury verdict of guilt and therefore reinstate the defendant's convictions.

We also reject, separately, the defendant's claim of *Batson* error in jury selection. *See Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). We uphold the district court's finding that the State provided a race-neutral explanation for striking a potential alternate juror.

## I.  Background Facts and Proceedings.

The following facts were presented to the jury. The defendant Tremayne Thomas and Marissa Ledbetter stood outside the Davenport

apartment of Raymond Norvell late in the evening of March 1, 2012. Norvell's apartment was a ground-level, one-bedroom apartment.

Officers from the Davenport Police Department, in a foot pursuit of a suspect in the area, noticed Thomas and Ledbetter shouting and heard loud noise coming from a window of Norvell's apartment. The officers inquired about the activity, but Thomas and Ledbetter assured them there was no problem. Thomas and Ledbetter then moved inside the apartment. One of the officers went to the door and was met by Norvell, who identified himself as the resident of the apartment. Norvell reassured the officer everything was fine, and the officers continued in pursuit of their suspect.

A few minutes later, the officers returned to the area outside Norvell's apartment and again heard yelling from the window. One of the officers approached the window. As the officer watched, a man later identified as Isaiah Henderson came into view, standing next to the kitchen microwave in the background of the scene. The officer testified he observed Henderson pull a marijuana blunt from his sweatshirt and begin smoking it.

Moments later, a man later identified as Brett Dennis approached Norvell's apartment. The officers followed Dennis toward the door and noted the smell of marijuana smoke wafting from the apartment when the door opened. The officers decided to attempt to seize the marijuana, so they quickly knocked and announced themselves and entered the apartment.

The apartment had two rooms—the kitchen (with a small attached bathroom) to the east and a back bedroom to the west. A single door connected the kitchen and the bedroom. The door was located in the

northeast corner of the bedroom and swung into the bedroom toward the north wall.

As the police announced their presence and entered the front room of the apartment in uniform, six persons were in that room. No one was in the bedroom. Three of those persons—Norvell, Ledbetter, and Derek Townsend—remained in the front room, sitting at the kitchen table. Dennis, who had just walked in, eventually got up from the kitchen table and left the residence. None of those four appeared to be interested in fleeing or hiding.

In contrast to those four, Henderson and the defendant Thomas quickly retreated from the front room to the bedroom in back. Henderson left his blunt behind and went immediately to the southwest corner of the bedroom—i.e., the opposite end of the bedroom from where the door was located. Henderson then stayed in that corner of the bedroom, away from the door and near a dresser. Thomas followed Henderson into the bedroom, closed the door, and tried to hold it shut.

One of the police officers, Officer Sievert, pushed against the door to the bedroom. Despite Thomas's efforts to hold the door shut, after several seconds, the officer was able to shoulder the door open. The officer ordered Henderson (still in the southwest corner) and Thomas (still in the northeast corner) to the ground. Henderson immediately complied. Thomas, however, remained standing and tried to engage the officer in discussion. The officer believed this was an effort at "misdirection." In any event, the officer had to force Thomas to the ground. The two men were then moved to the bed in the bedroom as the officers searched the room.

Behind the door that Thomas had been holding back and along the north wall near the northeast corner were two rows of neatly placed

women's purses belonging to Norvell. On top of the purses, police found a clear plastic baggie that contained four individually wrapped bags of marijuana and four individually wrapped bags of crack cocaine. The marijuana bags were $5 units, and the crack cocaine bags were $50 rocks, all prepackaged for sale.

The officers also found a phone and prescription medication belonging to Henderson on a dresser near the corner of the room where Henderson had initially been standing. Henderson explained that he had previously entered the back bedroom to charge his cell phone and had left his charging cell phone and a bottle of prescription pills on the dresser in the southwest corner. When the police came in, he admitted he had disposed of the blunt and headed back to that southwest area of the bedroom where the dresser with his cell phone and pills was located.

Thomas had no weapon or other contraband on his person. He did have $120 cash. The other persons who had been in the apartment had no money or contraband on their persons. In addition, Norvell denied any knowledge of the crack cocaine found in his bedroom. Henderson also denied any knowledge of the drugs found in the bedroom.

The packaging of the marijuana and crack cocaine was crinkled, so the police did not expect to find any fingerprints on the baggie or the bags. Although they checked all items for fingerprints, no fingerprints were subsequently detected.

The officers located a marijuana blunt in front of the microwave where Henderson had initially been standing when the officers observed him light the blunt from outside the window. A spoon with cocaine residue on it and several small, clear plastic bags were also located at the table where Norvell, Ledbetter, and Townsend were sitting.

After the police completed a search of the apartment, Thomas and Henderson were asked for identification. Henderson identified himself correctly to the officers, but Thomas gave a false name and claimed he could not remember his Social Security number. Thomas only gave his actual name when he was moved to the squad car and told he was under arrest for the evidence found in the bedroom and would be held as a "John Doe" until he could be identified through fingerprints.

Thomas claimed he had not been forthcoming about his name because he had an outstanding warrant for his arrest. However, the police checked, and there was no warrant. One of the officers later testified that it is "pretty typical" for a suspect to claim that he or she ran because of a warrant "so you won't have to acknowledge the presence of drugs."

Thomas was charged with possession with intent to deliver marijuana, possession with intent to deliver crack cocaine, a drug tax stamp violation, and interference with official acts. *See* Iowa Code § 124.401(1)(*c*)(3) (2011) (possession of crack cocaine); *id.* § 124.401(1)(*d*) (possession of marijuana); *id.* § 453B.3 (drug tax stamp violation); *id.* § 719.1(1) (interference with official acts). The drug tax stamp charge was eventually dropped. Thomas entered a plea of not guilty to the remaining charges in March 2012, and the case went to trial in July.

At the close of the two-day trial, Thomas moved for a directed verdict on the possession with intent to deliver charges, arguing there was insufficient evidence he had possessed the drugs in question. The district court denied the motion. The jury found Thomas guilty of all three charges. Thomas was sentenced to a period of imprisonment not to exceed ten years for the crack cocaine charge, a period not to exceed five years for the marijuana charge, and thirty days for the interference with

official acts charge. The court ordered the sentences to run concurrently. Additionally, Thomas was fined $1750 and ordered to pay court costs and attorney fees.

Thomas appealed and urged again that there was insufficient evidence to support the possession with intent to deliver charges. The court of appeals agreed with Thomas and set aside those convictions. We granted the State's application for further review.

## II. Standard of Review.

We have recently summarized our standard of review when reviewing the sufficiency of evidence in criminal cases as follows:

> Sufficiency of evidence claims are reviewed for . . . correction of errors at law. In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. [W]e will uphold a verdict if substantial record evidence supports it. We will consider all the evidence presented, not just the inculpatory evidence. Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence.

*State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (citations omitted) (internal quotation marks omitted).

## III. Analysis.

Iowa Code section 124.401 makes it unlawful for any person "to manufacture, deliver, or possess with the intent to manufacture or deliver, a controlled substance." Iowa Code § 124.401(1). In order for the State to establish possession of a controlled substance under this statute, it had to prove Thomas "exercised dominion and control over the contraband, had knowledge of the contraband's presence, and had

knowledge the material was a narcotic." *State v. Kern*, 831 N.W.2d 149, 160 (Iowa 2013) (citation omitted) (internal quotation marks omitted).

The State may show the defendant had either "actual possession" or "constructive possession." *Id.* at 160–61. At times, we have said that actual possession requires the contraband to be found on the defendant's person. *See id.* at 161; *State v. DeWitt*, 811 N.W.2d 460, 474 (Iowa 2012). Elsewhere, we have said that an individual has actual possession when the contraband is found on his or her person *or* when substantial evidence supports a finding it was on his or her person "at one time." *State v. Vance*, 790 N.W.2d 775, 784 (Iowa 2010). In other words, "[a]ctual possession may be shown by direct or circumstantial evidence." *Id.*

Under the *Vance* formulation, the distinction between actual possession and constructive possession does not turn on whether a defendant was apprehended with the contraband, but on whether there is sufficient evidence that contraband was in his or her physical possession at some point in time. *See id.*; *see also United States v. Cantrell*, 530 F.3d 684, 693 (8th Cir. 2008) ("A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it."); 8th Cir. Crim. Jury Instr. § 8.02 (rev. ed. 2013) (setting forth the same language). In *Vance*, the pseudoephedrine in question was not found on Vance's person at the time he was stopped, but there was evidence that a pharmacy had sold pseudoephedrine to an individual who had produced Vance's identification card. 790 N.W.2d at 784. In addition, among other things, Vance was the only person in the vehicle, the vehicle contained recently manufactured methamphetamine, a receipt for the pseudoephedrine was on the front driver's side of the vehicle, and Vance had the same identification card on his person. *Id.*

Based on this and other evidence, we found a jury "could reasonably infer Vance had actual possession of the pseudoephedrine pills." *Id.*

In any event, the doctrine of constructive possession allows the defendant's possession of contraband to be inferred based on the location of the contraband and other circumstances. *Id.* When drugs are found on premises in the exclusive possession of the accused, that may be enough to sustain a conviction. *See Kern,* 831 N.W.2d at 161; *DeWitt,* 811 N.W.2d at 474 (noting "possession may be inferred if the defendant is in exclusive possession of the premises in which the contraband was located"). But where the premises are jointly occupied, additional proof is needed. *See Kern,* 831 N.W.2d at 161; *DeWitt,* 811 N.W.2d at 474–75. We have identified the nature of the additional proof as follows:

> "(1) incriminating statements made by a person; (2) incriminating actions of the person upon the police's discovery of a controlled substance among or near the person's personal belongings; (3) the person's fingerprints on the packages containing the controlled substance; and (4) any other circumstances linking the person to the controlled substance."

*Kern,* 831 N.W.2d at 161 (quoting *State v. Maxwell,* 743 N.W.2d 185, 194 (Iowa 2008)). These factors are not exclusive, however, and merely act as a guide. *See DeWitt,* 811 N.W.2d at 475; *Maxwell,* 743 N.W.2d at 194.

Thomas, of course, did not have exclusive access to the bedroom where the drugs prepackaged for sale were found. But we believe a reasonable jury could conclude beyond a reasonable doubt that he had been in possession of them and dropped them from his person shortly before the police entered the room. To begin with, the drugs were found where Thomas had been holding the door back from the police. Also, no other logical explanation exists for Thomas's behavior. He had no weapon and, despite his claim to the contrary, no outstanding warrants.

To all appearances, what Thomas was doing when he held back the door was *buying time*. Holding back the door would not have made sense if Thomas's goal had been to get away from the police, but it made perfect sense if his goal was to get drugs off his person before the police got to him.

Of course, Norvell and Henderson also had connections to the bedroom. However, both of them denied any knowledge of the drugs. Henderson repeated his denial on the stand at trial. Additionally, neither Norvell nor Henderson offered any resistance or acted inappropriately in their dealings with the officers. Furthermore, if Norvell were the culprit, it would have been odd for him to leave drugs for sale sitting in plain view on top of two rows of purses neatly resting on the floor of his bedroom.[1] And Henderson had been in the other end of the bedroom from Thomas and the drugs.

In short, drugs were found in close proximity to the defendant; the defendant had taken actions explainable most logically as an effort to get the drugs off his person; and when apprehended, the defendant made false statements and engaged in misdirection. In addition, there was evidence tending to exclude the other two individuals who were known to have been in the bedroom from responsibility for the drugs.

The facts of this case can be compared to our recent drug-possession cases. In *Kern*, the defendant lived in a house with her boyfriend who maintained an extensive marijuana grow operation. 831 N.W.2d at 157, 160, 162. Although the evidence readily permitted an inference that the defendant *knew* about the marijuana, "there was no

---

[1]As the prosecutor urged during closing argument, "Drug dealers do not leave drugs laying out . . . ."

evidence that Kern was more than an agreeable bystander to a vast operation she permitted to take place." *Id.* at 162. The record lacked evidence pointing to the defendant's "dominion and control over the marijuana." *Id.* As we pointed out, "Our long-standing rule does not permit an inference of dominion and control based only on the presence of drugs in a jointly occupied premises." *Id.* Accordingly, we reversed the defendant's conviction for possession of marijuana. *See id.* Unlike in *Kern*, several facts here—including the specific location where the drugs were found and Thomas's own actions—allow a jury to conclude that Thomas personally exercised dominion and control over the drugs.

In *DeWitt*, officers found marijuana in the trunk of a car the defendant had been driving but did not own. 811 N.W.2d at 466, 474–75. The uncontested evidence showed five other individuals had access to the vehicle. *Id.* at 475. Nonetheless, we found the sum total of the evidence sufficient to support the defendant's conviction. *Id.* at 477. This evidence included the fact that the defendant was the most recent driver of the car and drove it frequently, suspicious activity by the defendant, the defendant's resistance to law enforcement, and information provided by a confidential informant as to which no hearsay objection had been made. *Id.* at 475–77. A number of the same factors are present here. The defendant was the person who had been most recently in the spot where the drugs were found, his conduct prior to his arrest was highly suspicious and makes sense only if his goal was to get the drugs off of his person, and he offered resistance.

*Maxwell* likewise involved drugs found in a vehicle. 743 N.W.2d at 189. In that case, Maxwell had been driving a vehicle that had an empty pack of cigarettes between the two front seats. *Id.* The pack turned out to contain crack cocaine. *Id.* A full pack of the same brand of cigarettes

was found on Maxwell's person. *Id.* Maxwell, however, did not own the vehicle. *Id.* We nonetheless found that Maxwell was not entitled to a new trial after he was convicted of possession. *Id.* at 195. We emphasized that Maxwell was the driver and the only person in the car at the time of the stop, that the pack containing the drugs was in Maxwell's plain view, that the drugs were found immediately next to Maxwell between the two front seats, and that Maxwell continued to drive for one hundred feet and then pulled into his driveway and got out of the car when the officer activated his lights. *Id.* at 194. Again, some of the same factors linking the defendant to the drugs are present here. In this case, the drugs were found in the spot where the defendant had just been, and his behavior was not merely mildly suspicious (as in *Maxwell*), but highly indicative of an effort by the defendant to get the drugs off his person.

In *State v. Nitcher*, the defendant had been staying at a house for a few days because he had an argument with his girlfriend. *See* 720 N.W.2d 547, 551 (Iowa 2006). Nitcher was not the owner of the house, and several other individuals were also occupying the house. *Id.* at 550–51. The house contained a meth lab. *Id.* at 550–52. In finding sufficient evidence that Nitcher had constructively possessed methamphetamine, we emphasized that his clothing contained an ether smell, and his fingerprint was on a pie plate containing pseudoephedrine. *Id.* at 559. The court also noted that the manufacturing process had occurred recently. *Id.* As we explained, "This constitutes substantial evidence to support the jury's finding as to the possession link between Nitcher and the methamphetamine when viewed in the context of the other evidence in the case." *Id.* Here, too, despite the fact that the apartment and the bedroom were not in Thomas's exclusive possession, there was substantial evidence linking Thomas personally to the drugs.

*State v. Carter* was another vehicle case. *See* 696 N.W.2d 31, 34–35 (Iowa 2005). Carter, the driver of the vehicle, engaged in evasive driving and made movements with his right hand when police tried to initiate a traffic stop. *Id.* at 34. He also gave a false name when police ultimately stopped the vehicle. *Id.* at 35. A baggie containing individually wrapped bags of crack cocaine was found in the center console of the car, the same area toward which Carter was seen moving his hand before the stop. *Id.* Carter had only $6.09 on his person and no cell phone, pager, or drug notes. *Id.* The passenger, on the other hand, had also been riding in the front of the vehicle and was found with $295.75 on his person. *Id.*

Carter argued the evidence was insufficient to sustain his conviction. *Id.* at 36. He pointed out that "the center console was close and equally accessible to the driver and the passenger," he was not the owner of the vehicle, there were no fingerprints on the drug package, and he had no drug paraphernalia on his person. *Id.* at 40. Yet we found the evidence sufficient to convict Carter based on (1) his suspicious activity before and after the stop; (2) the proximity of the controlled substances to where he was rummaging while police were attempting to stop the vehicle; (3) the presence of the baggie in a location where one would not ordinarily leave drugs; and (4) the passenger's denial that the drugs were his, combined with the passenger's cooperation with police. *Id.* We concluded the fact finder "could reasonably infer that Carter was exhibiting a proprietary interest in the controlled substances by desperately trying to hide them while the police were pursuing him." *Id.* at 41.

This case is in many respects a reprise of *Carter*. As in *Carter*, the defendant here did not own and was not in exclusive possession of the

place where the drugs were found. However, he was engaged in conduct that appeared to be an effort to avoid being caught with contraband, he then gave a false name to police when caught, and the contraband was found where the defendant had been making his suspicious movements just before he was apprehended (and it would have been otherwise odd for contraband to be there). Furthermore, the other person who was in the same room denied any connection to the contraband and had not engaged in suspicious activity. Thus, as in *Carter*, we believe the evidence is sufficient to sustain the convictions.

In *State v. Henderson*, we upheld the defendant's convictions for drug possession following law enforcement's entry for eviction purposes into an apartment she jointly occupied with a roommate. *See* 696 N.W.2d 5, 8–10 (Iowa 2005). Various drugs and drug-related items were found. *Id.* at 8. In our view, the defendant's vehement reaction to the entry "implied guilty knowledge," whereas the roommate's "obliging manner" did not. *Id.* at 9. We acknowledged that "one could also explain defendant's response to the situation by the fact that she was the object of a forcible eviction from her residence," but we noted that the roommate had denied the drugs were hers. *Id.* We believe the evidence here linking Thomas personally to the drugs, if anything, exceeds the evidence we remarked upon in *Henderson*. *Cf. State v. Kemp*, 688 N.W.2d 785, 787, 790 (Iowa 2004) (finding sufficient evidence to sustain a potential conviction when marijuana was found in a car that defendant owned and had been the most recent person to drive, although defendant was working on the vehicle with two other individuals and another individual was inside the vehicle as a passenger when police arrived).

By contrast, in *State v. Bash*, we had a *Kern*-type situation. *See* 670 N.W.2d 135 (Iowa 2003). The husband had a box containing

marijuana on his nightstand on his side of the bed. *Id.* at 136. The wife testified she did not know what was in the box but admitted she knew the box had contained marijuana in the past. *Id.* at 136–37. In finding the evidence insufficient to sustain the wife's conviction for possession, we noted the absence of evidence that she had any right to control the box or the marijuana in it. *Id.* at 138–39. In short, like *Kern* and unlike here, the evidence indicated at most that the defendant knew of the contraband, not that she had ever exercised control over it. *See id.*

In *State v. Cashen*, we also reversed a possession conviction for insufficient evidence. *See* 666 N.W.2d 566, 568 (Iowa 2003). In that case, a car with six people was stopped by law enforcement. *Id.* Four passengers were sitting in back, including the defendant Cashen who had his girlfriend on his lap. *Id.* A baggie of marijuana was found wedged into the rear seat on the side where the defendant and his girlfriend had been seated. *Id.* The girlfriend admitted the marijuana was hers. *Id.* The defendant had a lighter and rolling papers on his person; the girlfriend had rolling papers and a small baggie of marijuana seeds in her pocket. *Id.* The defendant was not the owner of the car, nor did he behave suspiciously when the car was stopped. *Id.* at 572. In determining that the evidence was insufficient to allow a jury finding of Cashen's guilt, we emphasized that on the question of dominion and control the State had only Cashen's proximity to the drugs, and "[t]he other three passengers riding in the back seat were just as close to the drugs as was Cashen." *Id.*

This case stands in contrast to *Cashen*. As we have already discussed, the defendant here was the last person present in the actual location where the drugs were found, the evidence supports an inference

that the defendant dropped them there, the defendant's conduct was highly suspicious, and others denied responsibility for the drugs.

Finally, *State v. Webb* involved another *Kern* scenario. *See* 648 N.W.2d 72, 79–81 (Iowa 2002). Three adults shared an apartment. *Id.* at 75. Marijuana was found in the kitchen and the living room. *Id.* Webb was not in the apartment when the police arrived, nor did he engage in suspicious conduct, nor were any of the relevant items found near or among his belongings, nor was there any evidence as to when he had last been in the apartment. *Id.* at 79–80. Webb did have $336 on his person when he subsequently arrived at the apartment, but he said he had received the money from his roommate. *Id.* at 80. In sum, we assumed there was sufficient evidence that Webb knew about the marijuana but found insufficient evidence that he had the ability to maintain control over it. *See id.* at 81. This case, on the other hand, puts the defendant most recently in the location where the marijuana had been found, with considerable circumstantial evidence that he had dropped it there.

"Direct and circumstantial evidence are equally probative." Iowa R. App. P. 6.904(3)(*p*); *State v. Schrier*, 300 N.W.2d 305, 308 (Iowa 1981). This rule applies to possession cases. *See State v. Welch*, 507 N.W.2d 580, 583 (Iowa 1993). Considering the totality of the evidence in this case, it is sufficient to raise a "fair inference of guilt" and generates "more than suspicion, speculation, or conjecture." *DeWitt*, 811 N.W.2d at 475. As the foregoing review of our recent drug possession caselaw indicates, the present case fits comfortably among our precedents where we have found the evidence sufficient to sustain a finding of guilt.

Thomas, who is African-American, also urges that his constitutional rights were violated when the State struck the only

minority from a panel of three potential alternates in his case. *See Batson*, 476 U.S. at 96–98, 106 S. Ct. at 1723–24, 90 L. Ed. 2d at 87–89. Jury selection was not reported. However, the State told the district court that it had exercised its peremptory challenge on this particular juror because when asked about police officers' credibility, "he was very emphatic in shaking his head and told me that he didn't believe their credibility." The court overruled Thomas's *Batson* challenge for the following reasons:

> The Court acknowledges that [this potential alternate juror] did emphatically shake his head and said he had a problem with officer credibility. The Court wrote that down in its notes and circled that as an issue. The Court does think that's a race-neutral reason for the strike, and the Court will allow the strike.

In any event, the alternate juror who was actually chosen was never seated as a regular juror in the case.

Giving deference to the trial court's finding, we conclude there was no *Batson* error because the State had a race-neutral reason for striking this potential alternate juror. *See State v. Griffin*, 564 N.W.2d 370, 375–76 (Iowa 1997) (rejecting a *Batson* challenge and noting that a reviewing court ordinarily should give "great deference" to the trial court's findings in this area). We do not reach the State's alternative argument that if a *Batson* error occurred, it was harmless because the alternate juror was never seated as a regular juror and did not participate in deliberations.[2]

---

[2]We also do not reach any of Thomas's claims of ineffective assistance of counsel. Thomas may bring those claims in a postconviction relief proceeding. *See State v. Clay*, 824 N.W.2d 488, 502 (Iowa 2012) (noting the defendant may bring ineffective-assistance-of-counsel claims in a postconviction relief action).

**IV. Conclusion.**

For the foregoing reasons, we affirm the district court's judgment and sentence and vacate the decision of the court of appeals.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AND SENTENCE AFFIRMED.**

All justices concur except Hecht, Wiggins, and Appel, JJ., who dissent.

**HECHT, Justice (dissenting).**

Police officers standing outside Raymond Norvell's residence observed Isaiah Henderson inside smoking marijuana. After knocking on the door, announcing their presence and entering the residence, the officers found several persons, drug paraphernalia near several of the persons, and marijuana and crack cocaine. Tremayne Thomas, one of the persons found inside the residence, who was neither a resident at the apartment nor the person whom the officers had observed moments earlier through the window smoking marijuana there, was convicted of possession of the marijuana and crack cocaine with intent to deliver the drugs. In an opinion faithfully applying this court's decisions on the doctrine of constructive possession, the court of appeals concluded the State failed to produce sufficient evidence supporting Thomas's conviction. As I believe the court of appeals got it right, I respectfully dissent.

I begin with a brief overview of the applicable law. Iowa Code section 124.401 makes it unlawful "to manufacture, deliver, or possess with the intent to manufacture or deliver, a controlled substance." Iowa Code § 124.401(1) (2011). We have explained that to establish possession of a controlled substance for purposes of this provision, the State must prove an accused has exercised dominion and control over the substance, had knowledge of its presence, and had knowledge of the identity of the substance. *State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008). In explicating the meaning of these requirements, we have frequently maintained proof of access to a place where a substance is found cannot by itself support a finding of unlawful possession. *See State v. Cashen,* 666 N.W.2d 566, 572 (Iowa 2003) ("Simply because a

person can reach out and grasp something does not mean he or she has control or dominion over the object."); *see also Maxwell*, 743 N.W.2d at 194; *State v. Bash*, 670 N.W.2d 135, 137 (Iowa 2003); *State v. Webb*, 648 N.W.2d 72, 77 (Iowa 2002) (quoting *State v. Reeves*, 209 N.W.2d 18, 22 (Iowa 1973)).

Instead, we have often noted the State may employ either of two formulations of proof in its attempt to establish possession. When a substance is found on an accused's person, we have described the concept as "actual possession," and noted the State may present direct evidence of actual possession in making its case. Alternatively, we have also explained the State need not establish possession by direct evidence of actual possession, and instead, the State may present its case based on a theory of "constructive possession."[3] The doctrine of constructive possession has been characterized as "a legal fiction used by courts to find possession in situations where it does not in fact exist, but where they nevertheless want an individual to acquire the legal status of possessor." Charles H. Whitebread & Ronald Stevens, *Constructive Possession in Narcotics Cases: To Have and Have Not*, 58 Va. L. Rev. 751, 761–62 (1972) [hereinafter Whitebread & Stevens].

The concept of constructive possession is used to modestly extend the concept of actual possession and include under its umbrella those cases where the inference of possession at some time in the past is

---

[3]I note the State advanced its case at trial only in terms of "constructive possession," because, as the prosecutor explained there, where individuals "have the ability to try and flee and throw that substance . . . so that it cannot be taken directly off their person . . . this fact pattern is the norm and in most instances the officers deal with constructive possession." On appeal, the State contends more generally the jury was free to find the real reason for Thomas's elusive behavior was his actual possession of the drugs on his person when the police arrived and when he entered the bedroom.

exceptionally strong. *See State v. Barber*, 92 P.3d 633, 638 (N.M. 2004); *see also Reeves*, 209 N.W.2d at 22 (expounding constructive possession principles and explaining "if the accused does not have exclusive control of the hiding place possession may be imputed if he has not abandoned the narcotic and no other person has obtained possession"); 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.1(e), at 433 (2d ed. 2003) ("Constructive possession . . . is simply a doctrine used to broaden the application of possession-type crimes to situations in which actual physical control cannot be directly proved . . . ."). A showing of constructive possession, we have said, requires the State to establish an accused has knowledge of the presence of the substance and has the authority or right to maintain control of the substance. *See Maxwell*, 743 N.W.2d at 193. In some cases, as where an accused exclusively possesses the premises where a substance is discovered, an accused's authority or right to maintain control might be inferred. *Reeves*, 209 N.W.2d at 23. Even when the inference is established in those cases, however, we have cautioned the inference is rebuttable and not conclusive. *Id.*

We have cautioned even more strongly against the inference of possession when an accused has not been in exclusive possession of the premises, and we have mandated the accused's knowledge of and ability to control a substance must be established by proof beyond presence on the premises or mere physical proximity to contraband found there. *See id.*; *see also State v. Kern*, 831 N.W.2d 149, 161 (Iowa 2013). In these "joint" possession or occupancy cases, we have explained the State must typically present proof of immediate and exclusive possession of the place where drugs are found on a premises, and additional proof such that we can be satisfied the accused has possessed the substance for purposes of

the statute. *Reeves*, 209 N.W.2d at 23. That additional proof may take the form of proof of incriminating statements made by the accused, incriminating actions upon the police's discovery of the substance among the accused's belongings, fingerprints on the packaging containing the substance, and any other circumstances establishing a possessory link between the accused and the substance. *Maxwell*, 743 N.W.2d at 194. Regardless whether the actual possession or constructive possession formulation is advanced by the State, however, our purpose in setting forth these formulations and evidentiary factors for consideration has always been to ensure the State can establish, by something more than speculation, that the accused has actually exercised possession of the substance recovered beyond a reasonable doubt.[4] *See Reeves*, 209

---

[4]I note the articulation of possession principles in our recent decision in *State v. Vance*, 790 N.W.2d 775, 784–85 (2010), is consistent with the principle I describe here, and consistent with the purposes underlying the standards for proving possession we have set forth in our prior decisions addressing these standards. In *Vance*, we explained "actual possession" may be shown by direct or circumstantial evidence, and concluded the defendant's actual possession of a pharmacy receipt for pseudoephedrine and additional circumstantial evidence were sufficient to support a finding that at one time the defendant had actually exercised possession of the pseudoephedrine. *See Vance*, 790 N.W.2d at 784. *Vance* departed from the very clear trend in our caselaw and the decisions of other courts in applying the label of "actual possession" to a case where the State presented evidence an accused may have exercised possession of a substance at some point in the past. *See, e.g.*, *State v. Carter*, 696 N.W.2d 31, 39–40 (Iowa 2005) (engaging in constructive possession analysis in case where substance was found in the same place where driver had been moving his hand prior to stop, because substance "was not found on his person"); *Cashen*, 666 N.W.2d at 568–69 (noting, where marijuana was found wedged in car seat where accused had been sitting, "the possession to be found, if any, must be constructive" because "the officers did not find the marijuana on [defendant's] person"); *see also People v. Gallagher*, 55 P.2d 889, 890 (Cal. Dist. Ct. App. 1936) (articulating constructive possession doctrine and applying it where defendant directed officers to his lodging house and explained morphine could be found in his mattress); *Kern*, 831 N.W.2d at 161 ("Because no marijuana was found on Kern's person, she was not in actual possession of the marijuana."); *State v. DeWitt*, 811 N.W.2d 460, 474 (Iowa 2012); Whitebread & Stevens, 58 Va. L. Rev. at 755 (explaining doctrine of constructive possession originated to address those cases where actual possession at the time of arrest cannot be shown, but where the inference the defendant had possession at one time is very strong). Our examination of the evidence in *Vance*, however, and our resulting conclusion the State's evidence was sufficient to

N.W.2d at 21 (explaining unlawful possession must be established by proof "the accused exercised dominion and control (i.e., possession) over the contraband").

When reviewing findings of guilt in possession cases, we will uphold the findings when substantial evidence supports the verdict beyond a reasonable doubt. *See Kern*, 831 N.W.2d at 158. We review the evidence presented at trial in the light most favorable to the State, but we consider all the evidence in the record and not just the evidence favoring the State. *Id.* We have often observed direct or circumstantial evidence of possession may constitute substantial evidence for purposes of our review. *See, e.g., Reeves*, 209 N.W.2d at 21. We have also routinely said circumstantial evidence may often be equally as or even more persuasive than direct evidence in any given case. *See, e.g., State v. Hearn*, 797 N.W.2d 577, 580–81 & n.1 (Iowa 2011) (noting aiding and abetting must be proven by same evidentiary standard regardless

---

establish the accused had at one time exercised possession of the substance functioned to satisfy the same standard we have always set forth for determining whether the State has established the statutory possession requirement. In other words, in *Vance*, as in every possession case, we were confronted with and answered the question of whether the State had presented sufficient evidence to establish, beyond a reasonable doubt, that an accused had actually exercised possession of the substance in question. *See Vance*, 790 N.W.2d at 784 (concluding evidence could establish accused possessed pseudoephedrine based on evidence he purchased the pills from CVS, evidence of his exclusive occupancy of vehicle in which pseudoephedrine, coffee grinder, and recently manufactured methamphetamine were found, his incriminating statements, and the paraphernalia found in his pockets); *cf.* Michael S. Deal, United States v. Walker: *Constructive Possession of Controlled Substances: Pushing the Limits of Exclusive Control*, 2 J. Pharmacy & L. 401, 405 n.43 (1994) (explaining, for purposes of establishing possession, "[t]here must either be a requirement that exclusive control over the area where the contraband is found must exist, or substantial evidence that defendant possessed the drug on his person at some time in the past must exist" (citing Whitebread & Stevens, 58 Va. L. Rev. at 766–74)). Undeterred by our longstanding evidentiary threshold in drug possession cases, the majority, without significant discussion on this point, dismisses out of hand every other applicable case in our history of possession jurisprudence and applies the "*Vance* formulation" in a manner lowering the bar for conviction.

whether evidence is direct or circumstantial and finding substantial evidence of defendant's active participation in crime); *State v. Bentley*, 757 N.W.2d 257, 262–63 (Iowa 2008) (explaining, in kidnapping case, State need not "affirmatively disprove" any hypothesis someone other than accused removed victim where evidence indicated accused was only occupant of house other than victim's sleeping grandmother and younger siblings); *State v. Radeke*, 444 N.W.2d 476, 479 (Iowa 1989) (noting direct evidence and circumstantial evidence may be equally probative and concluding evidence of defendant's use of threats and force to induce victim to unbutton her blouse was sufficient to allow jury to find defendant had intent to commit sexual assault beyond a reasonable doubt).

We have also explained, however, that in possession cases where the State fails to present evidence an accused possessed the proscribed items at the time of arrest, and instead aims to prove possession at some time prior, the evidence of past possession " 'must be entirely consistent with defendant's guilt, wholly inconsistent with any rational hypothesis of his innocence, and so convincing as to exclude any reasonable doubt that defendant was guilty of the offense charged.' " *Reeves*, 209 N.W.2d at 21 (quoting *State v. Schurman*, 205 N.W.2d 732, 734 (Iowa 1973)); *see also State v. McDowell*, 622 N.W.2d 305, 308 (Iowa 2001) (overturning conviction in case where State presented evidence of defendant's frequent dominion and control of portions of another's bedroom where gun was found, but failed to present any evidence specifically linking defendant to the gun); Whitebread & Stevens, 58 Va. L. Rev. at 763 (explaining even evidence of "exclusive dominion and control" cannot justify a finding of possession in the absence of "evidence establishing the fact that no one else could have exercised control over the drugs"); *cf. Webb*, 648 N.W.2d

at 81 (explaining evidence must have a " 'visible, plain, or necessary connection' " with possession (quoting Black's Law Dictionary 1295 (6th ed. 1990))); *State v. Atkinson*, 620 N.W.2d 1, 5–6 (Iowa 2000) (examining case involving "impermissible pyramiding of inferences" and overturning conviction despite evidence of evasive movement and proximity to and knowledge of substances, because any inference about defendant's exercise of control would have been "based on pure speculation" (quoting *State v. Snyder*, 635 So.2d 1057, 1058 (Fla. Dist. Ct. App. 1994) (first quote))).

This demanding standard for proof of possession must be met, we have explained, because we must ensure the evidence—whether direct or circumstantial and whether characterized as actual or constructive— generates something more than an inference of suspicion and instead raises a real inference of guilt beyond a reasonable doubt. *See Reeves*, 209 N.W.2d at 21; *see also State v. Vance*, 790 N.W.2d 775, 783 (Iowa 2010) (noting evidence is substantial only if it would convince rational trier of fact of guilt beyond a reasonable doubt); *cf. United States v. Hernandez*, 301 F.3d 886, 893 (8th Cir. 2002) ("[T]here is a critical line between suspicion of guilt and guilt beyond a reasonable doubt."); *Parker v. Renico*, 450 F. Supp. 2d 727, 735 (E.D. Mich. 2006) ("Here, while the evidence may have lead to a 'reasonable speculation' that the [accused] was in possession . . ., without stacking inferences there is insufficient evidence to prove [possession] beyond a reasonable doubt . . . .").

This court's decisions applying the court-created doctrine of constructive possession reveal a cautious, but very sound, jurisprudential approach. When the defendant in a drug case is not found to have actual possession of contraband, we have held a conviction cannot stand in the absence of proof beyond a reasonable doubt the

defendant—rather than someone else who is present with the defendant—actually possessed the contraband at some prior time. Thus, when a residence or vehicle containing an illegal substance is occupied by more than one person, we have required more than inference piled upon inference amounting ultimately to mere speculation supporting a finding that the defendant, rather than someone else present at the time, exercised dominion and control over the illegal substance. In my view, the majority's conclusion the evidence was sufficient to support a finding Thomas—rather than others present in Norvell's apartment—possessed the marijuana and cocaine found there sometime before the officers arrived relies not on legitimate inference countenanced by our prior caselaw, but instead on multiple inferences amounting to speculation.

Approaching the matter in chronological order, I begin with what the officers knew about possession of illegal drugs in this case *before* they entered Norvell's apartment. One of the officers heard a female voice—apparently that of Ledbetter, the only female in the apartment—scolding another occupant for interacting with the police too cavalierly and thereby risking arrest when the officers had stopped at the front door minutes earlier. One could at least speculate that Ledbetter was concerned about the prospect of being arrested because she knew illegal drugs were present in Norvell's apartment. While peering through the window, the officers had watched Henderson—not Thomas—smoking marijuana while standing near the microwave in the kitchen of the apartment.

When the officers entered the apartment, they first encountered Ledbetter, Norvell, and Derek Townsend, who were seated at the kitchen table. On that table were a spoon with cocaine residue on it and several small, empty, clear plastic bags. Thus, before the officers entered the

bedroom and arrested Thomas, they saw Henderson smoking marijuana and passed by Norvell—the only resident of the apartment—and two other persons seated around a table in close proximity to evidence that cocaine, and perhaps other drugs, had been used there recently.

There was no direct evidence linking Thomas to the marijuana and cocaine found in Norvell's bedroom atop one of Norvell's purses located there on the floor. No fingerprints were found on the sandwich bag, or the individual plastic bags within it, and no other drug paraphernalia was found in the room. There was no testimony from any witness who claimed to have seen Thomas throw or place the small, clear plastic bags in the location where they were found. The majority nonetheless finds inferences from circumstantial evidence sufficient to support the conviction. I will explore each of the circumstances in turn.

As the officers entered the apartment, Henderson and Thomas moved from the front room—a combined living and kitchen area in view of the front door—into Norvell's bedroom. The evidence is undisputed Henderson entered the bedroom first, followed by Thomas. The majority concludes a reasonable juror could infer that Thomas had the marijuana and cocaine on his person when the officers entered the apartment, and he went into the bedroom to get rid of them. I believe the majority's inference on this point is based on sheer speculation under the circumstances presented here. Henderson, the only person the officers had seen actually using marijuana, entered the bedroom before Thomas.[5] He testified he had never seen Thomas holding the drugs. The

---

[5]In the subsequent search of the apartment, the officers located a phone and prescription medication belonging to Henderson on a dresser in the bedroom. The record further suggests Henderson had placed those items there at some time before the officers arrived. Thus one could at least speculate that Henderson—whom the officers had seen smoking marijuana—placed the marijuana and cocaine on Norvell's

other three occupants, who had been found within arm's reach of small plastic bags like those found in the bedroom, likewise gave no indication they had ever seen Thomas holding or accessing the drugs. On these facts, I conclude Henderson's possession was equally consistent with the State's theory the drugs eventually discovered had been recently discarded.[6] *See Cashen*, 666 N.W.2d at 572–73 (overturning conviction in part because "[t]he other three passengers riding in the back seat were just as close to the drugs as was Cashen"); *Webb*, 648 N.W.2d at 79 ("None of these items were found in a place that was immediately and exclusively accessible to Webb and subject to his dominion and control.").

Moreover, as I have noted, Norvell, the only resident of the apartment, and two other persons were seated at the table where the spoon containing cocaine residue and small plastic bags were located. No one saw either Henderson or Thomas drop or throw the marijuana and cocaine on Norvell's purse as the two entered the bedroom. Accordingly, I conclude Thomas's movement into the bedroom behind Henderson upon the officers' entry raises no credible inference stronger than speculation that Thomas more likely than any other person present exercised dominion and control over the drugs at some prior time.

The majority also suggests it is significant no other person in Norvell's apartment claimed knowledge or ownership of the marijuana

---

purse when he was in the bedroom earlier depositing his phone and medication on the dresser. One could further speculate that the marijuana the officers had seen Henderson smoking just minutes earlier had been just part of his stash, while the remainder of it was located in Norvell's bedroom.

[6]I also note the officers testified that when questioned shortly after the discovery of the drugs, Henderson indicated he knew nothing about their origin and gave no indication he had seen Thomas discard them.

and cocaine found in Norvell's bedroom. If I found this circumstance supportive of an inference of Thomas's guilt, perhaps I might also consider significant the fact that Henderson explicitly testified he had no reason to believe Thomas had controlled the drugs. No comparable testimony was advanced regarding the other occupants and their connection to the contraband. I do not, however, find any part of this evidentiary picture in which no other occupant claimed knowledge or ownership surprising or significant, and I do not find it supportive of an inference even remotely approaching reliability tending to prove Thomas—more likely than any other person present—exercised dominion and control over the contraband.

Nor do I share the majority's willingness to countenance an inference that Thomas must have hurriedly deposited the drugs on Norvell's purse upon entering the bedroom because drug dealers do not normally leave their drugs in plain view. The suggested inference is truly extraordinary in my experience, as the reported cases in which law enforcement officers enter a residence and find drugs and paraphernalia strewn about are legion. *See, e.g.*, Mona Lynch, *Crack Pipes and Policing: A Case Study of Institutional Racism and Remedial Action in Cleveland*, 33 Law & Pol'y 179, 195 (2011) ("[M]any such cases come in when police enter a residence or hotel room and find the crack pipes, almost always in plain view." (Citation and internal quotation marks omitted.)); *see also* I. Bennett Capers, *Crime, Legitimacy, and Testilying*, 83 Ind. L.J. 835, 869 (2008) ("To justify unlawfully entering an apartment where officers believe narcotics or cash can be found, they pretend to have information from an unidentified civilian informant or claim they saw the drugs in plain view after responding to the premises on a radio run." (quoting Comm'n to Investigate Allegations of Police Corruption and the Anti-

Corruption Procedures of the Police Dep't, City of New York, *Commission Report* 36 (1994))); Samuel R. Gross & Katherine Y. Barnes, *Road Work: Racial Profiling and Drug Interdiction on the Highway*, 101 Mich. L. Rev. 651, 673 (2002) ("Typical bases for probable cause to search on I-95 include: drugs in plain view; the odor of burnt marijuana; and occasionally a 'K-9 alert' by a police dog trained to detect illegal drugs."). In my view, only the speculation with the most doubtful support links the drugs' presence in plain view to Thomas with any more force than to any other occupant of Norvell's apartment. A more likely inference is the drugs remained in plain view because the three people seated at the kitchen table and Henderson were in the process of using them shortly before the officers arrived, and there was no perceived reason compatible with the intended near-term use to conceal them.

After completing the search, the officer asked Thomas and Henderson for identification. Henderson complied, but Thomas initially gave a false name and birthdate and indicated he could not remember his Social Security number. When a records check for the name came up blank, the officers confronted Thomas, who identified himself and explained he had behaved as he did because he believed there was an outstanding out-of-state warrant for his arrest. Henderson testified Thomas had expressed the same concern as the officers were entering the apartment and they had moved to the bedroom. The officers later determined Thomas had been mistaken and there was no outstanding warrant.[7]

---

[7]The officers' testimony revealed two propositions about the potential significance of Thomas's explanation of his behavior as a result of his mistaken belief in an outstanding arrest warrant: (1) individuals will often give fake names or engage in misdirection, as Thomas did here, because they have outstanding warrants, and (2)

The majority also asserts a cognizable inference connecting Thomas to the contraband arises from the fact that he closed the bedroom door, sought to hold it shut against the officers' attempt to enter, and did not accurately identify himself when asked to do so. We have previously noted evidence of suspicious behavior or furtive movements by an accused may be an important factor in our determination of whether the State has presented substantial evidence of possession. *See Cashen*, 666 N.W.2d at 572 (noting lack of suspicious behavior); *Atkinson*, 620 N.W.2d at 5–6 (considering evidence of alleged furtive movements of a passenger in a motor vehicle). The State suggests Thomas's flight to the bedroom upon the officers' entering the apartment, his resistance at the bedroom door, and his relaying of a false name each support an inference of guilt.

We have long explained that for purposes of our analysis, we typically consider as a single circumstance "the fact of an accused's flight, . . . resistance to arrest, . . . [and] assumption of a false name," in determining what inferences are to be drawn from this kind of conduct. *State v. Wimbush*, 260 Iowa 1262, 1268, 150 N.W.2d 653, 656 (1967) (quoting 2 *Wigmore on Evidence* § 276, at 111 (3d ed. 1940)). Moreover, we have often emphasized the caution with which we must consider "suspicious" behavior or evidence of flight. *See, e.g., State v. Bone*, 429 N.W.2d 123, 126–27 (Iowa 1988) (noting any marshaling instruction on flight evidence "should include the caveat that there may be reasons for the flight (or concealment) which are fully consistent with innocence"); *cf. Kentucky v. King*, 563 U.S. __, __, 131 S. Ct. 1849, 1862, 179 L. Ed. 2d

---

individuals sometimes express fabricated beliefs in outstanding warrants as efforts to misdirect officers' attention from the trouble at hand.

865, 881 (2011) ("[E]ven if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time."); *Florida v. Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 1324, 75 L. Ed. 2d 229, 236 (1983) (explaining a police officer is free to approach a suspect without grounds for a stop, but the suspect's choice to walk away and not listen to the officer "does not, without more, furnish those grounds").

We have expressed this caution in part because the value of evidence of resistance or flight depends entirely on the degree of confidence with which we can draw a chain of very specific, and often improperly speculative, inferences from the evidence. *See, e.g., United States v. Hankins*, 931 F.2d 1256, 1261 (8th Cir. 1991). That chain would have us conclude an accused's behavior actually constitutes flight or resistance, conclude the flight or resistance clearly indicates the accused's consciousness of some kind of guilt, conclude the consciousness of some kind of guilt clearly indicates the accused's consciousness of guilt of the crime eventually charged, and conclude consciousness of guilt with respect to the crime eventually charged clearly indicates the accused's actual guilt of that crime. *See id.*; *see also Bone*, 429 N.W.2d at 125 (explaining "departure from the area where a crime has allegedly taken place is of marginal probative value" and noting other unexplained circumstances must be taken in conjunction with the departure to reasonably justify an inference of guilt); *cf. Webb*, 648 N.W.2d at 81 ("When the fact or facts proposed to be established as a foundation from which indirect evidence may be drawn, by way of *inference*, have not a visible, plain, or necessary connection with the proposition eventually to be proved, such evidence is rejected for 'remoteness.'" (quoting Black's Law Dictionary 1295 (6th ed. 1990))).

As a result of this very tenuous nature of flight and resistance evidence, we have often noted its presence in prosecutions for possession of illegal drugs, but we have remained reluctant to find a real inference from such evidence that the accused actually exercised possession of the illegal substance eventually found. *See, e.g.*, *Atkinson,* 620 N.W.2d at 5–6. Instead, where an accused raises some plausible explanation for behavior the State invites us to find suspicious and suggestive of guilt of the crime charged, we have generally rejected the State's proposed inference as too speculative in the absence of something more. *See, e.g., id.* (noting, where accused explained her "furtive" hand movements as the result of an attempt to move her nearby purse, any "conclusion that the defendant exercised control over [the contraband] by attempting to hide it would be based on pure speculation").

Here, I cannot find the evidence of Thomas's resistance substantial evidence of his possession of the cocaine and marijuana found in Norvell's bedroom on Norvell's purse. This conclusion is based in part on both Henderson's explanation and Thomas's own explanation for his behavior—namely, his mistaken but nonetheless real fear of the outstanding warrant for his arrest. Those explanations alone weaken my confidence in the chain of inferences the State urges from the resistance evidence, as they cast substantial doubt on the notion Thomas's behavior was attributable to consciousness of guilt for possessing the drugs under the circumstances presented here.

The majority also places great emphasis on the fact the marijuana and cocaine were found by the officers near where Thomas stood while

resisting the officers' entrance into the room.[8] But, as I have already noted, this court's decisions have consistently held mere proximity to contraband in a jointly occupied structure or vehicle will not suffice to support a conviction based on constructive possession. The compelling need to apply this principle here seems obvious because the bedroom was Norvell's, the purse on which the drugs were found was Norvell's, the officers had seen Henderson smoking marijuana just moments before he entered the bedroom, and all the other occupants of the apartment were seated around a table where the cocaine residue-laden spoon and empty plastic bags were found.

Our caselaw confronting similar scenarios affirmatively counsels against a conviction here, given the discovery of the paraphernalia near the other three occupants, and the discovery of the drugs among Norvell's belongings, in Norvell's bedroom. *See Webb*, 648 N.W.2d at 79, 81 (overturning possession conviction and noting none of the prohibited "items [were] found near or among Webb's personal belongings"); *McDowell*, 622 N.W.2d at 308 ("There is no evidence that defendant had ever accessed the purse belonging to Scott in which the firearm was contained."). The inference to be drawn from the totality of this evidence points away from Thomas, suggesting it was more likely the marijuana and cocaine belonged to someone else present in the apartment, and accordingly, suggesting it was more likely some other occupant possessed it for purposes of our analysis.

The cases cited by the majority, by contrast, examine starkly different scenarios, where the evidence supporting guilt has been far less

---

[8]Henderson's testimony indicated Thomas was not by the wall behind the door when the officers actually entered the bedroom, but instead had retreated away from the door toward the bed as the officer forced the door open.

speculative than the evidence we consider here. In *DeWitt*, for example, officers corroborated information from a confidential informant who had previously specifically identified DeWitt, his intent to sell the drugs eventually discovered, and the vehicle in which he would be traveling with the drugs. *State v. DeWitt*, 811 N.W.2d 460, 465 (Iowa 2012). Although other individuals had "occasional[]" access to the vehicle where the drugs were found, DeWitt was the sole occupant at the time of discovery, and we noted DeWitt "was the most recent driver" and "a frequent driver of the car: he drove it six days a week for work." *Id.* at 475–76. Notably, for purposes of our analysis here, the scenario in *DeWitt* involved no other individual who might have been suspected of controlling the drugs. On those facts, the *Dewitt* scenario presented far less risk of inappropriate speculation than the facts we consider here.

The circumstances in *State v. Carter*, 696 N.W.2d 31 (Iowa 2005), are likewise distinguishable. There, officers, in attempting to stop a vehicle for a license plate infraction, observed the vehicle "cross[] three lanes of traffic, [strike] the curb, and just miss[] a light pole." *Carter*, 696 at 34. While that was happening, officers observed the driver "making movements with his right hand all the way down to the floorboard, causing his head to go down so he could not see the road." *Id.* On further investigation, the officer discovered drugs "in the same area toward which the driver of the Blazer was moving his hand just prior to the stop." *Id.* at 35. On those facts, we concluded, "the district court could reasonably infer that Carter was exhibiting a proprietary interest in the controlled substances by desperately trying to hide them while the police were pursuing him, resulting in his losing control of the Blazer." *Id.* at 41. And, we added, "Carter's furtive movements in contrast to the passenger's lack of such movements would further support such an

inference." *Id.* Here, we had no evidence of Thomas's movement toward the purses, we had evidence affirmatively delinking Thomas from the drugs in the form of Henderson's testimony, and we had evidence of flight from both Henderson and Thomas. *Carter* therefore bears little, if any, resemblance to our facts for purposes of concerns about speculativeness, despite the majority's strained attempt to conclude otherwise.[9]

The majority also notes Thomas had $120 cash on his person, while the others present in Norvell's apartment had none. We have previously acknowledged in our caselaw that some substantial sum of money found on an accused in conjunction with discovery of drug paraphernalia in the accused's residence may, in certain instances, support a finding of possession. *See State v. Randle*, 555 N.W.2d 666, 668, 672 (Iowa 1996) (examining a scenario where police found $395 on an accused). We have also explained, however, that even where an illegal substance is found in an accused's residence, in the absence of more substantial evidence like fingerprints on the recovered substance, immediate and exclusive access to the substance, or discovery among the personal belongings of the accused, evidence of discovery of a similar sum of money on an accused is "too tenuous and speculative to support an inference of constructive possession." *Webb*, 648 N.W.2d at 80

---

[9]The majority labors even more strenuously in attempting to rely on *Maxwell* and *Nitcher*. In *Nitcher*, we had evidence of the defendant's occupancy of the premises where drugs were discovered, his fingerprint on paraphernalia involved in the drug manufacturing process and laden with precursor residue, the scent of precursor emanating from his clothing, and additional paraphernalia used in the manufacturing process located in close proximity to his clothing in his bedroom. *See State v. Nitcher*, 720 N.W.2d 547, 558 (Iowa 2006). In *Maxwell*, we had evidence the defendant was the sole recent occupant of the vehicle in which the drugs were found, the drugs were found in a box of cigarettes wedged between the front seats in reach of the defendant as he was driving, and the defendant was found with a box of the same brand of cigarettes on his person, in addition to the evidence of his furtive behavior. *Maxwell*, 743 N.W.2d at 194. Neither case raises anything like the spectre of speculation we confront here.

(examining scenario where accused was found with $336 on his person). Regardless the nature of the circumstances, however, I conclude $120 falls far short of the threshold value on which a reasonable fact finder may rely as circumstantial evidence tending to prove possession of drugs. Common sense dictates this amount fails to reliably indicate dealing in controlled substances. *See, e.g.*, *State v. Brown*, 313 S.E.2d 585, 589 (N.C. 1984) (noting "over $1,700 in cash" was a figure worth considering in its possession analysis).

More importantly, in both *Webb* and *Randle*, we noted the importance of the discoveries of contraband in the residences of the accused—a circumstance conspicuously absent here. *See Webb*, 648 N.W.2d at 81; *Randle,* 555 N.W.2d at 672. The value of the money recovered from Thomas was equally consistent with any number of eventualities, including a weekly trip to the ATM, the purchase of a few tickets to a baseball game, or a trip to the grocery store. As we have often explained, and as I think it important to emphasize in this case with respect to both the money found in Thomas's possession and the totality of the circumstances, "when two reasonable inferences can be drawn from a piece of evidence," such evidence can give rise only "to a suspicion, and, without additional evidence, is insufficient to support guilt." *State v. Truesdell,* 679 N.W.2d 611, 618–19 (Iowa 2004).

In cases like this where reasonable inferences other than the ones the State urges may be drawn, I would conclude the evidence cannot support a finding of guilt. *See id.*; *Cashen,* 666 N.W.2d at 572–73; *cf.* George H. Singer, *Constructive Possession of Controlled Substances: A North Dakota Look at A Nationwide Problem,* 68 N.D. L. Rev. 981, 1008 (1992) (noting joint occupancy cases require "the most exacting scrutiny" and "possession cannot be established by virtue of the fact that the

defendant has been in the company of one who has a narcotic on his or her person or is present in an area where narcotics are found," and explaining "[i]ndependent evidence that links each defendant to the contraband must be presented").

Taking all the evidence together, then, I conclude Thomas's brief proximity to where the drugs were eventually discovered and his strong reluctance to interact with the police cannot constitute substantial evidence of his possession of the marijuana and cocaine. Numerous other equally plausible explanations of the sequence of events linking the marijuana and cocaine to others abound here, and I thus cannot find the State's evidence was "wholly inconsistent with any rational" explanation of Thomas's innocence. *See Reeves*, 209 N.W.2d at 21 (quoting *Schurman*, 205 N.W.2d at 734). Accordingly, I conclude the district court erred in failing to grant Thomas's motion for directed verdict on the possession charges and I would therefore affirm the well-reasoned opinion of the court of appeals.

I also think it prudent to note that as of mid-year 2013, there were approximately 1860 individuals incarcerated in Iowa prisons for drug offenses as their most serious offense. *See* Div. of Criminal & Juvenile Justice Planning, Iowa Dep't of Human Rights, *Iowa Prison Population Forecast FY2013–2023*, at 26 (2013) [hereinafter *2023 Forecast*] ("[T]he percent of inmates serving sentences for drug crimes (as their most serious offense) has increased from two percent in 1988 . . . to 23 percent in 2001, remaining at 23 percent in 2013 . . . ."); *id.* at 12 ("Drug admissions have been one of the driving forces behind rising prison populations in Iowa for more than the past decade, reaching their peak in FY2004, when 32 percent of the new inmates entering prison were committed for drug offenses. More broadly, between FY2004 and

FY2013, nearly 27 percent of Iowa's prison population has entered prison after conviction for drug crimes."). The doctrine of constructive possession is a court-made construct. This court has historically limited the doctrine's application in drug cases by upholding convictions only when the State has linked a defendant to illegal substances through proof that establishes his dominion and control and thereby excluded other persons jointly occupying a space who might also be suspected of having some connection with the contraband as a consequence of their presence. Put another way, we have acted as careful gatekeepers of a court-made doctrine and by doing so have avoided exacerbating the overcrowding of our prisons with drug offenders. *See 2023 Forecast*, at 3 ("By June 30, 2014, Iowa's prison population is expected to exceed official capacity by about 750 inmates, or by about 10 percent, if current offender behaviors and justice system trends, policies, and practices continue. . . ."); Div. of Criminal & Juvenile Justice Planning, Iowa Dep't of Human Rights, *Public Safety Advisory Board Report to the Iowa General Assembly* 3 (2013) [hereinafter *PSAB Report*] ("Eliminating mandatory sentences for low/low moderate risk [drug] offenders would result in cost savings without changing return-to-prison rates."). Moreover, our careful application of our possession jurisprudence in the past has been consistent with our distaste for systems of selective prosecution and our respect for the autonomy rights of individuals engaging in legal social behavior. *See* Michael S. Deal, United States v. Walker: *Constructive Possession of Controlled Substances: Pushing the Limits of Exclusive Control*, 2 J. Pharmacy & L., 401, 405 (1994) (noting in the absence of a standard like the one advocated by Whitebread and Stevens, "numerous problems arise in conjunction with use of the constructive possession doctrine; including, the difficulty courts have in assessing liability in possession cases, liability for presence at a place

where drugs are being used and the creation of a system of selective law enforcement"); *see also 2023 Forecast*, at 13 ("Another factor pertaining to drug commitments that bears continued inspection is the relationship between Iowa's historically high rate of African-American imprisonment and drug commitments."); *PSAB Report*, at x ("The over-representation of African-Americans in the prison population has been an ongoing issue for Iowa."). I dissent here because I believe the court's decision today is inconsistent with these values and takes us in a markedly different direction.

Wiggins and Appel, JJ., join this dissent.