**IN THE COURT OF APPEALS OF IOWA**

No. 15-1704
Filed December 21, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**RICKY L. OVERSTREET,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Mark J. Smith,

Judge.

        Ricky Overstreet appeals his conviction for child endangerment.

**AFFIRMED.**

        Mark C. Smith, State Appellate Defender, and Maria L. Ruhtenberg,

Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Jean C. Pettinger and Tyler J.

Buller, Assistant Attorneys General, for appellee.

        Considered by Potterfield, P.J., Tabor, J., and Scott, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**SCOTT, Senior Judge.**

Ricky Overstreet appeals his conviction for child endangerment, alleging his counsel was ineffective for failing to move for a severance of trial, there was insufficient evidence to support the conviction, and the district court erred in admitting hearsay testimony. We affirm.

## I.    Background Facts and Proceedings

On May 19, 2013, Heather Davis, a child protection worker from the Iowa Department of Human Services (DHS), went to the home of Gloria Overstreet and her son, Ricky Overstreet, to investigate an anonymous call received about Ricky's daughter, T.O., in which the source reported T.O. was being physically abused by Ricky and Gloria and was receiving inadequate food and clothing. At the time, T.O. was eight years old. She had lived with Ricky and Gloria since she was three, having previously lived with her mother.[1]

Gloria refused Davis access to her home, so Gloria, Ricky, T.O., and Davis met in the yard. T.O. was dressed in long pants and long sleeves that covered her neck and arms, even though the day was unseasonably warm. Davis observed Gloria had long fingernails. Davis asked to speak with T.O. alone, but the request was denied. When Davis asked T.O. in front of Ricky and Gloria how she was disciplined, T.O. said she was told to stand in the corner or write sentences.

---

[1] In 2012, T.O.'s mother expressed her desire that T.O. live with her again. She indicated Ricky and Gloria had previously allowed her visits with T.O., but after this request, they stopped communicating with her, so she called DHS and the police in an effort to see her daughter.

The following day, the principal at T.O.'s school was confronted with concerns about Gloria's treatment of T.O. The principal had T.O. examined by the school nurse; the nurse and principal found marks on T.O.'s body and contacted the police. The principal testified at trial the marks were "very concerning. Much more significant than what [she] had seen before on other children." She further testified T.O. would often say things regarding her concern about the discipline at home, specifically with regard to Gloria.

The police were called to the scene, and T.O. agreed to have the injuries photographed; these photos were entered into evidence at trial. The responding officer testified at trial that T.O. had "scarring and marks on either side of her neck" and "several pattern marks, linear scars, on her back." The officer described the marks on T.O.'s neck as "claw marks" made by "a person," which were consistent with what T.O. told the officer had happened. The officer indicated there was a pattern to the markings on T.O.'s back that made it "very clear" to the officer "some sort of object [was] used," which "matched up with what [T.O.] had described to [the officer] [was] happening to her"; specifically, that she had been hit with a spatula. As to the timing of the injuries, the officer stated the injuries "were pretty extensive" with "numerous scars" showing "different stages of scarring" with "some more recent, some had been there a while, so it was clear to [the officer] that this had been ongoing."

Davis was also contacted to come to the school, and she personally observed the fingernail marks on T.O.'s neck and multiple scratches on her back and first heard T.O. was stating Ricky and Gloria had injured her. T.O.'s mother also observed the markings and testified they resembled being spanked with an

object. T.O. was then placed in the care of her mother. That same day, police officers executed a search warrant on Gloria and Ricky's home. During the search, police officers seized two spatulas and a spoon from the home. An officer testified to her belief one of the objects collected had caused the injury, although she admitted it was "for the most part" a standard-looking spatula. Both Davis and the officer testified Gloria told them during the search she did not want T.O. back.

On May 23, 2013, T.O. was examined by Dr. Barbara Harre, of the Child Protection Response Clinic, who specializes in child abuse pediatrics. T.O. told Dr. Harre she had multiple injuries to her back, caused by Gloria hitting her with a spatula. T.O. said she was hit with a spatula as discipline from the age of six until she was eight. She also told Dr. Harre that Ricky had struck her with the spatula as well. T.O. identified marks on her neck, which she stated were caused by Gloria strangling her. She stated Gloria would lift her off the floor by the neck, sometimes until she lost consciousness. T.O. also identified marks not caused by Gloria or Ricky, including a bite mark on her cheek inflicted by a cousin, a scar on her forearm she caused when she dropped an iron on her wrist, and a birthmark on her arm. Dr. Harre testified T.O.'s ability to identify marks and distinguish their origin told her that T.O. "understands that different injuries can occur in different ways, and [T.O.'s] able to give that history."

Dr. Harre then examined T.O., observing the bite mark to her face and marks on her back and neck. Dr. Harre testified the markings on T.O.'s neck were consistent with fingernail-type impressions and indicative of a pattern of repeat behavior. Dr. Harre further testified to "parallel lines distributed all over

[T.O.'s] back" and that these parallel lines "suggest[ed] more of a controlled contact" making it "much more likely that there's an object involved."

As to the timing of the injuries, Dr. Harre testified about a "general rule" that skin "remodeling"—or healing—can take up to a year. Dr. Harre stated that during follow-up visits with T.O. she noticed "significant resolution of the degree of injuries" to both T.O.'s neck and back, although she was unable to identify the age of the marks. An officer also testified to photographing T.O.'s injuries a couple months after the initial report was made and stated some scars had faded but distinct scarring remained.

On cross-examination, Dr. Harre testified to additional information T.O. provided her: that T.O. was required to wake at 3 a.m. and perform chores—like wash dishes, vacuum the floor, and set mouse traps—and that she was only fed bread and water. Despite T.O.'s testimony regarding her nutritional intake, Dr. Harre noted T.O. was not malnourished, except for a vitamin D deficiency.

T.O. testified Ricky and Gloria hurt her using a spatula, Gloria touched her neck, and she used to have scratches on her neck. When T.O. testified, she confirmed she was required to wake at 3 a.m. and do chores but denied performing the specific chores she had previously told Dr. Harre. She also denied remembering what she ate when she lived with Ricky and Gloria.

Gloria's friend, who lived with Ricky and Gloria at the time in question, also testified at trial, stating T.O. "constantly needed discipline," which consisted of her writing sentences or standing in the corner. He denied ever seeing corporal punishment used, but he admitted he was not around all of the time. He further testified that when T.O. moved in with them he noticed no physical

injuries, except "probably a couple of scratches," such as "a couple on her back and places like that." He also stated T.O. "got scratched up by the cats a lot."

On October 9, 2013, Ricky and Gloria were charged with child endangerment resulting in bodily injury and child endangerment resulting in serious injury. The State subsequently dismissed the latter charge. After numerous continuances, a jury trial commenced on August 10, 2015. Ricky was convicted of the lesser included charge of child endangerment. Ricky appeals.

## II.     Analysis

### A.     Severance of Trial

Ricky asks this court to find his counsel was ineffective for failing to move to sever his trial from his mother's trial. We may consider an ineffective-assistance-of-counsel claim for the first time on appeal, and our review is de novo. *See State v. Philo*, 697 N.W.2d 481, 485 (Iowa 2005). However, we find further development of the record is necessary to resolve this issue and preserve this claim for postconviction-relief proceedings. *See State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010).

### B.     Sufficiency of the Evidence

Ricky contends there was insufficient evidence to support his conviction for child endangerment.[2] We review Ricky's sufficiency-of-the-evidence claim for correction of errors at law. *See State v. Vance*, 790 N.W.2d 775, 783 (Iowa 2010). "We will sustain the jury's verdict if it is supported by substantial evidence." *Id.* "Evidence is substantial if it would convince a rational trier of fact

---

[2] The State claims various aspects of Ricky's sufficiency-of-the-evidence challenge were not preserve for our review. We assume, without deciding, error was preserved.

the defendant is guilty beyond a reasonable doubt." *Id.* (quoting *State v. Jorgensen*, 758 N.W.2d 830, 834 (Iowa 2008)). Direct and circumstantial evidence are equally probative. *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011).

Iowa Code section 726.6(1)(a) (2013) provides:

> A person who is the parent, guardian, or person having custody or control over a child . . . commits child endangerment when the person . . . [k]nowingly acts in a manner that creates a substantial risk to a child or minor's physical, mental or emotional health and safety.

Ricky contends the State failed to prove the following element of the offense, as defined in the jury instructions at trial:

> [Ricky] acted with knowledge in any one of the following ways:
> a. By creating a substantial risk to T.O.'s physical, mental or emotional health or safety; or
> b. By an intentional act or series of intentional acts, uses reasonable force, torture, or cruelty that results in bodily injury; or
> c. By an intentional act or series of intentional acts, evidences unreasonable force, torture or cruelty which causes substantial mental or emotional harm to a child or minor.

Ricky maintains there is insufficient evidence to support that he knowingly created a substantial risk to T.O., as it was Gloria who inflicted the injuries. Ricky further alleges any evidence regarding his actions toward T.O. can be attributed to lawful discipline.

A substantial risk is met where there is "a showing that the risk is real or articulable." *State v. Anspach*, 627 N.W.2d 227, 232-33 (Iowa 2001). T.O.'s principal, an investigating police officer, Dr. Harre, T.O.'s mother, and Davis all observed the injuries to T.O.'s person. T.O. told Dr. Harre that Ricky had hit her with a spatula. Davis testified she first learned T.O. was claiming Ricky and

Gloria had caused the injuries when she responded to the call from T.O.'s school. The police officer testified T.O.'s injuries were consistent with the story T.O. provided and the spatula found in Ricky and Gloria's home matched the injuries T.O. had sustained. Similarly, Dr. Harre testified T.O.'s injuries were consistent with "a controlled contact" where some type of object was involved. T.O. herself testified Ricky had hurt her using a spatula.

Moreover, "[a] person may commit child endangerment without physical contact with the child." *State v. Hickman*, 576 N.W.2d 364, 368 (Iowa 1998). T.O. testified the injuries were inflicted over multiple years. A police officer testified the marks were "numerous" and "extensive" with multiple stages of healing. Davis testified, "You didn't have to get close to [T.O.] at all to see [the marks on] her neck." T.O.'s principal also testified the injuries to T.O. were "[m]uch more significant than what [she] had seen before on other children." These injuries—which testimony supports had been inflicted over time— improved following T.O.'s removal from Gloria and Ricky's residence. Sufficient evidence supports the jury's finding that Ricky created a substantial risk to T.O. *See State v. Parker*, No. 06-0946, 2008 WL 2038420, at *1 (Iowa Ct. App. May 14, 2008) (affirming the district court's finding a mother was guilty of child endangerment resulting in serious injury where the mother failed to intervene on her daughter's behalf when the daughter was subjected to a series of abusive acts by her father); *see also State v. Leckington*, 713 N.W.2d 208, 214 (Iowa 2006) (finding a woman knowingly created a substantial risk when she left an intoxicated minor at her home without adult supervision); *State v. Osborn*, No. 12-1146, 2013 WL 2637291, at *3-4 (Iowa Ct. App. June 12, 2013) (finding

sufficient evidence under section 726.6(1)(a) where the mother "understood [a convicted sex offender] posed a risk to the safety of her children and nonetheless allowed her children to live with him").[3]

And we are not persuaded by Ricky's contention his acts merely constituted lawful discipline. We acknowledge parents have "a right to inflict reasonable corporal punishment in rearing their children." *Hildreth v. Iowa Dep't of Human Servs.*, 550 N.W.2d 157, 159 (Iowa 1996). "The proper test is whether, under the particular circumstances, the amount of force used or the means employed by the parent rendered such punishment abusive rather than corrective in character." *State v. Arnold*, 543 N.W.2d 600, 603 (Iowa 1996). Ricky relies on the court's finding in *Hildreth*, claiming the circumstances here are comparable. *Hildreth* involved a single incident of discipline where a father spanked his daughter three times on the buttocks with a wooden spoon leaving welts that lasted a few days. 550 N.W.2d at 158-59; *see also id.* at 160 (determining the father "could not reasonably have foreseen that the rather limited striking of [the child's] buttocks would produce a physical injury"). Here, this was not a one-time event. The evidence supports the conclusion T.O. endured repeated injurious contact with a spatula, leaving multiple scars of varying ages. Moreover, these marks lasted for months, not just days.

Lastly, Ricky argues he did not "knowingly act" because he did not know the results of his conduct. *See State v. James*, 693 N.W.2d 353, 357 (Iowa 2005) (noting the code requires the jury find "the defendant acted with knowledge

---

[3] We note section 726.6(1)(a) requires a knowing "act . . . that creates a substantial risk to a child." The requisite "act" can be "a failure to do any act which the law requires one to perform." Iowa Code § 702.2.

that []he was creating a substantial risk to the child's safety"). Again, this is not a one-time incident where a parent was unaware the discipline would produce a physical injury. Nor could a parent maintain such an argument when the "punishment" includes lifting a child by the neck, strangling them until they lose consciousness. As discussed above, sufficient evidence supports a finding the on-going injury to T.O. was readily apparent. Because sufficient evidence supports the jury's finding, we affirm.

### C.    Hearsay Statements

Finally, Ricky contends the district court erred by allowing Dr. Harre to testify about T.O.'s statements regarding the injuries she sustained, their cause, and the individuals T.O. claimed caused those injuries. We review hearsay claims for errors at law. *See State v. Newell*, 710 N.W.2d 6, 18 (Iowa 2006). A court must exclude hearsay unless it is admitted as an exception or exclusion to the hearsay rule. *Id.* "Subject to the requirement of relevance, the district court has no discretion to deny the admission of hearsay if it falls within an exception, or to admit it in the absence of a provision providing for admission." *Id.*

One such exception arises where the disputed statements were made for the purpose of medical diagnosis or treatment. *See* Iowa R. Evid. 5.803(4). "The rationale for the exception is that statements made by a patient to a doctor for purposes of medical diagnosis or treatment are 'likely to be reliable because the patient has a selfish motive to be truthful.'" *State v. Smith*, 876 N.W.2d 180, 185 (Iowa 2016) (citation omitted).

> The medical diagnosis or treatment exception imposes two requirements. First, the exception applies to statements "made for purposes of medical diagnosis or treatment." Iowa R. Evid.

5.803(4). Second, the statements must describe "medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." *Id.* Thus, the first requirement is directed at the purpose and motive of the statement, and the second requirement is directed at the content or description of the statement.

*Id.*; *see also State v. Tracy*, 482 N.W.2d 675, 681 (Iowa 1992) ("[F]irst the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." (quoting *United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985))). One such circumstance where identifying statements are admissible "involves the identity of perpetrators of child abuse." *Smith*, 876 N.W.2d at 185 "When the 'alleged abuser is a member of the victim's immediate household, statements regarding the abuser's identity are reasonably relied on by a physician in treatment or diagnosis.'" *Id.* (citation omitted). This is because "[t]he emotional and psychological injuries of such abuse are treated by the doctor along with the physical injury." *Id.*

Dr. Harre explained that a child's history is ninety percent of her diagnosis and provides the context for what she finds in a physical examination of the child. She specifically testified to her need to know the identity of the abuser to protect a child "from continued injuries and physical inappropriate interaction." Dr. Harre explained the closeness of the relationship between a child and her abuser also impacts the intensity of the emotional reaction the child may have to what has happened—which impacts the child's view of herself and is a consideration as part of the child's treatment. Although Dr. Harre was aware T.O. no longer lived

with Gloria and Ricky at the time of the evaluation, Dr. Harre testified she was not sure whether T.O. might be returned to their care and custody. *See id.* ("The doctor is also often concerned about the possibility of recurrent abuse."). Ricky notes Dr. Harre testified her treatment of T.O.'s physical injuries would not have changed regardless of T.O.'s willingness to identify or truthful identification of her abuser. Dr. Harre went on to clarify, however, that this did not make the identification unnecessary for treatment purposes. It remained important for ensuring T.O. was protected and identifying other services and treatment she may need.[4] While it did not impact the treatment of the physical injuries themselves, it was indicative of the possible consequences of those injuries. Dr. Harre explained that knowing the identity of the abuser assisted her overall diagnosis and treatment plan.

Dr. Harre testified she talks with children—like T.O.—to build a "special relationship" so that they know her role is to help them feel better. Following this talk, T.O. discussed the various marks on her body and described their source—she identified a birthmark, a mark on her cheek caused by a cousin biting her, a mark on her forearm caused when she dropped an iron on her wrist, and the marks on her back and neck caused from being hit with a spatula by Ricky and Gloria and choked by Gloria. The fact T.O. was able to identify the various marks and their sources indicates she was able to fairly and honestly distinguish

---

[4] Ricky notes Dr. Harre "did not make any other referrals to other care providers for therapy or treatment." However, Dr. Harre testified "there was some discussion about possibly some therapy" for T.O., but T.O.'s mother informed Dr. Harre the child was already seeing a counselor for mental-health issues. The fact Dr. Harre did not end up needing to refer T.O. for other services does not make the information less pertinent to Dr. Harre's evaluation or diagnosis of T.O.

between their sources. Dr. Harre testified she believed T.O. was aware she was having this conversation with Dr. Harre to aid Dr. Harre in treating her. While we note Dr. Harre testified she did not instruct T.O. not to lie, there is no indication in the record T.O.'s motive in making the statements to Dr. Harre "was other than as a patient responding to a doctor's questioning for prospective treatment." *Tracy*, 482 N.W.2d at 681. We conclude the statements fall within the rule 5.803(4) exception. *See Smith*, 876 N.W.2d at 187 ("Eliciting the identity of a perpetrator of child abuse can be a normal aspect of medical treatment and diagnosis for child abuse victims; however, the value of that information is established by the foundational testimony of the doctors and medical providers in each case, and that testimony explains the pertinence of the perpetrator's identity to the diagnosis and treatment of the victim in the unique circumstances of each case.").

Moreover, the testimony of Dr. Harre regarding the source and nature of T.O.'s injuries was consistent with the testimony provided by T.O. Davis also testified to the allegations made against Gloria and Ricky, that Gloria had long fingernails, that T.O. identified Gloria and Ricky as the individuals who caused the injuries, and that she personally saw the marks on T.O. A police officer also testified the marks on T.O.'s neck appeared to have been made by a person, the marks on her back appeared to have been caused by an object, and all injuries were consistent with T.O.'s rendition of events. Thus, Dr. Harre's testimony was cumulative and not prejudicial. *State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998) (finding the "erroneous admission of hearsay" was not prejudicial because it was "merely cumulative" with the testimony of the child or a social worker).

**III.    Conclusion**

For the foregoing reasons, we find there was substantial evidence supporting Ricky's conviction.  We further find the district court did not err in admitting Dr. Harre's testimony about T.O.'s statements and no prejudice resulted because the testimony admitted was cumulative.  We preserve Ricky's claim of ineffective assistance of counsel for postconviction-relief proceedings.

**AFFIRMED.**

Tabor, J., concurs; Potterfield, P.J., concurs specially.

**POTTERFIELD, Presiding Judge.** (concurring specially)

I disagree with the majority's conclusion that the statements made by T.O. to Dr. Harre were admissible under the exception to the hearsay rule for statements made for purposes of medical treatment or diagnosis. *See* Iowa R. Evid. 5.803(4). Dr. Harre was not a treating physician encountered in an emergency room or medical center. She is an evidence-gatherer to whom T.O. was taken three days after her abuse was discovered and after she had been removed from the care of Ricky and Gloria Overstreet. T.O. was already in counseling and had already given statements regarding the perpetrators of her injuries. She expected no treatment from Dr. Harre and received none. *Cf. State v. Smith*, 876 N.W.2d 180, 185 (Iowa 2016) (noting that statements made for the purpose of diagnosis are generally considered reliable "because the patient has a selfish motive to be truthful" (citation omitted)). The motivation for her identification of her perpetrators had nothing to do with medical treatment. *See id.* at 190 (finding the witness's statement about the identity of the perpetration not subject to the exception because "the State presented insufficient evidence that the identity of the assailment was reasonably pertinent to [the witness's] diagnosis or treatment").

It is true the identifications were cumulative to her testimony. While it is undoubtedly true that Dr. Harre's testimony provided substantive bolstering to T.O.'s testimony, the doctor's testimony was cumulative. In a case where two perpetrators are charged and tried together, we are mindful that the identification by a child could be colored by greater loyalty to one or the other. But nothing in this record allows us to speculate about that, leaving the admission of Dr. Harre's

testimony as error but cumulative.  *See State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006) (stating the admission of hearsay evidence "will not be considered prejudicial if substantially the same evidence is properly in the record").